Edward E. Maxwell et al., Appellees, v. Lafayette Mc-Williams, Appellant.

Gen. No. 14,030.

Edward E. Maxwell et al., Appellees, v. Daniel M. Lord, Appellant.

Gen. No. 14,031.

1. RESCISSION—*extent of relief in equity.* It is not within the province of a court of equity under the mask of a legal fiction of "rescission" to punish a fraud.

2. FIDUCIARY RELATION—*remedy where secret profit has been made.* One who ostensibly acts as an associate of syndicate members, when, in fact, he is acting as a promoter, is liable to his principals for the return of any secret profit received by him.

3. APPEALS AND ERRORS—*when finding of chancellor not disturbed as against the evidence.* If a cause has been tried before the chancellor chiefly on oral testimony, his findings upon conflicting evidence will not be disturbed on review unless clearly against the weight of the evidence.

4. FRAUD—*how may be established.* Although the evidence of fraud must be clear, satisfactory and persuasive, it may, notwithstanding, be circumstantial.

5. EQUITY—*what relief may be granted under general prayer.* Under the general prayer for relief contained in a bill in equity, relief may be granted which is consistent with the facts set up.

6. ACCOUNTING—*extent of equitable jurisdiction to award.* Those forming a syndicate to purchase interests in land, or the like, thereby establish a *quasi*-partnership or fiduciary relation which confers upon equity jurisdiction to award an accounting against those who as the purchasing agents misapply trust funds confided to them.

7. ACCOUNTING—*against whom decree should run.* Upon the award of an accounting to recover secret profits, not only those holding a fiduciary relation and handling money should be made the subject of a decree, but, likewise, those who have unlawfully shared in such profits.

8. ACCOUNTING—*what does not discharge liability.* A voluntary payment made under a mistaken view of the law to one not entitled to the accounting, does not discharge the liability to account to those parties who are entitled thereto.

Bill in chancery. Appeal from the Circuit Court of Cook county;

the Hon. JULIAN W. MACK, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed December 7, 1908.

**Statement by the Court.** These cases are separate appeals from the same decree of the Circuit Court. They have been consolidated for hearing on one transcript of the record, set of abstracts and briefs. They will therefore be disposed of together.

The transcript of the record contains 1500 typewritten pages, the abstract 368 printed ones, and the various briefs and arguments in the aggregate 550 more. In this mass of matter the best method of statement of the questions involved is, we think, to give the findings and orders of the decree appealed from, and then to state the objections to the decree and the contentions involved covered by the assignment of errors by the appellants and the cross-assignment of errors by the appellees.

The decree was entered July 19, 1907.

It was after a hearing of evidence oral and documentary by the chancellor, on an amended bill filed June 28, 1906, in which Edward E. Maxwell, James H. Gilbert, Charles H. Conrad, William N. Eisendrath, Calvin M. Favorite, George Woodland, Adolph Nathan, Helen W. Hamilton and Frank T. Hamilton, Administrators of the Estate of John M. Hamilton, deceased, and Sarah M. Snitzler and John T. Snitzler, Executors of the last will and testament of John H. Snitzler, deceased, were complainants, and Lafayette McWilliams, D. W. Kimball, Daniel M. Lord and the H. G. & M. Oil Company, a corporation, were defendants, the answer and amended answer of McWilliams, Lord and Kimball thereto (the H. G. & M. Oil Company having been defaulted for want of an answer), and the replications of complainants.

Its findings, recitals and orders are:

1. That prior to December 1, 1904, McWilliams and Kimball became the joint owners of an option by means whereof they were entitled to purchase cer-

tain oil and gas leases of about 500 acres of lands in Madison county, Indiana, from one Joseph N. Tait, upon the payment to Tait of $50,000 and the further payment of $2,500 to one William C. Hoag for his commissions as the agent and broker of Tait in negotiating the option.

2. That being unwilling to purchase and operate said properties for their own account, but being desirous of effecting a sale thereof at a profit, McWilliams and Kimball undertook to find other persons who should become purchasers of said property at $70,000, but failed to do so within the period of their original option.

3. That thereupon McWilliams and Kimball secured an extension of said option at the price of $57,500, of which $55,000 was to be paid to Tait and $2,500 to Hoag, and associated with themselves Daniel M. Lord in a further attempt to sell said option at a profit.

4. That McWilliams, Lord and Kimball, then acting in concert, during the last days of November and the first days of December, 1904, requested Edward E. Maxwell, James H. Gilbert, Charles H. Conrad, William N. Eisendrath, Calvin M. Favorite, George Woodland, Adolph Nathan, John M. Hamilton, John H. Snitzler (said Hamilton and Snitzler having since died), to join wth them, the said McWilliams, Lord and Kimball, in the purchase of said oil and gas leases, and during the course of the negotiations represented to these nine persons, Maxwell, Gilbert, Conrad, Eisendrath, Favorite, Woodland, Nathan, Hamilton and Snitzler (called hereafter in the decree "the investors"), that they, McWilliams, Lord and Kimball (called hereafter in the decree "the defendants"), had an option for the purchase of said property at the price of $70,000; that said $70,000 was the amount which would have to be paid to the owners of said leases, and that the investors were being offered a

chance to come into a good thing at the ground floor price.

5.   That each and every one of said representations was false and fraudulent, and was known to be so by the defendants, and was knowingly made by the defendants and each of them to the investors and each of them, to induce them to purchase said property at a price higher than that at which the defendants could purchase the same under their option.

6.   That the relations between McWilliams and Lord and some or all of the investors, had for many years been friendly and intimate, and that the said investors had a right to rely on the truth of the said representations; that said Maxwell, Gilbert, Conrad, Eisendrath, Favorite, Woodland and Nathan did rely on the truth of said representations and believed them to be true; that Snitzler and Hamilton died before the hearing of the cause, and there is no affirmative testimony that either of them did or did not believe or rely on said representations, or knew or did not know the true facts concerning the amount of said option price, other than the fact that the said representations were made in their presence and that they thereupon, with the other investors, made the payments hereinafter set forth; that therefore the court finds that said Hamilton and Snitzler did rely on and believe said representations; that after the making of said representations the investors paid to the defendants the following sums of money respectively:

| | |
|---|---|
| Edward E. Maxwell, | $11,000. |
| James H. Gilbert, | 10,000. |
| Charles H. Conrad, | 2,000. |
| William M. Eisendrath, | 7,000. |
| Calvin M. Favorite, | 7,000. |
| George Woodland, | 1,000. |
| Adolph Nathan, | 5,000. |
| John H. Snitzler, | 7,000. |
| John M. Hamilton, | 14,000. |
| Total, | $64,000; |

that the defendants then and there agreed to contribute to said fund of $70,000, as and for their respective shares of such purchase, the following sums:

| | |
|---|---|
| Lafayette McWilliams, | $1,000. |
| D. W. Kimball, | 1,000. |
| Daniel M. Lord, | 4,000. |
| Total, | $6,000; |

that these payments were made on December 3, 1904, and that McWilliams and Kimball paid their shares to Lord on that day.

7. That contemporaneously with the payment of said sums of money, it was agreed between the investors and the defendants that the defendant Lord should take said money and examine said property, and that if certain representations hereinafter referred to, concerning the production and equipment of the property, were found by him to be true, he should exercise the said supposed option of purchase at $70,000, and that otherwise he should return the money to the investors. Whereupon Lord, acting ostensibly as a joint investor with the others, and as their agent, and concealing from the said investors all knowledge of the fact that he was interested in making such a sale, and that he and his associates would obtain a profit if the property were taken by the investors at the price of $70,000, accepted from them the moneys above referred to, aggregating the sum of $64,000, made an examination of said property, used $57,500 thereof to exercise the aforesaid secret option of himself and his co-defendants, McWilliams and Kimball, reported to the investors that he had closed the deal, caused the said property to be turned over and conveyed to the corporation hereinafter referred to, and divided the sum of $12,500, the secret profit in the transaction aforesaid, between himself and his said associates, share and share alike. That is, Lord paid $4,166.66 in cash to McWilliams, $4,166.66 in cash to Kimball, and himself retained $166.66 in cash and thereafter received from

the corporation stock of the par value of $4,000 as being fully paid, without any further additional payment on his part, with like effect as though he had actually contributed $4,000 to said fund of $70,000 and had subsequently drawn the same out again on account of his share of said profit.

8.   That before or at the time of the payment of the money to Lord, it was agreed by the investors and defendants that a corporation with a capital stock of $70,000 should be formed to take and hold the title to said property, and that the investors and defendants should receive stock at par for the amount of their respective investments; that with the knowledge of each of the defendants and the active co-operation of Mc-Williams and Lord, a corporation was duly organized under the laws of Indiana, on December 13, 1904, with a capital stock of $70,000, named the H. G. & M. Oil Company; that its whole capital stock was issued to the investors and defendants in amounts equal to those set out in paragraph 6 of the decree.

9.   That the defendants, by virtue of the rights vested in them jointly by their said option, and in the exercise thereof, on the 8th day of December, 1904, procured an assignment of certain of said oil and gas leases to the H. G. & M. Oil Company, a copy of which said assignment is attached to the original bill as Exhibit A; that said defendants also assigned to said corporation another certain gas and oil lease to make good the total acreage which they had represented to said investors as the acreage of the property originally included in their said option; the title of a portion of the property covered by said option having failed and been found to be defective, said last mentioned lease being dated December 6, 1904, and running from one Shannon and wife to the said defendants as lessees, a copy being attached to the original bill as Exhibit B.

10.   That the said corporation had not then been fully organized, and that it was mutually understood by the investors and defendants that the said corporation should acquire and hold the title to said leases and

property, and that fully paid shares of stock should be issued and delivered to each investor and defendant to represent their said respective interests.

11.   That in June, 1905, said Gilbert, Hamilton and Maxwell received information which led them to suspect that the price paid for said property had been less than $70,000; that they investigated, and in October, 1903, obtained certain information of the facts before recited in the decree, and communicated the same to the other investors, and Gilbert and Maxwell thereupon confronted the defendant Lord with the facts so discovered, whereupon Lord admitted and stated that he had participated in a secret profit as above stated, and thereupon, without the knowledge of his co-defendants, McWilliams and Kimball, paid into the treasury of said corporation the sum of $4,000, which said payment the court finds is not to be applied on account of his obligation to the complainants herein as individuals, although the decree is not in any way to prejudice or affect the right of said Lord, if any, to recover said sum of $4,000 from said corporation.

That in consideration of the premises, the defendants, McWilliams, Lord and Kimball, are under obligation to repay to the complainants 64/70 of $12,500, being the sum of $11,428.57, together with interest thereon at the rate of five per cent. per annum from December 3, 1904, to the date of the decree, being $1,486.39, in addition, thus making a total of interest and principal of $12,904.96, and that each complainant may have execution against the said defendants for such a proportion of said last mentioned sum as his respective investment bears to $70,000, being as follows:

| | |
|---|---|
| Edward E. Maxwell, 11/70, | $2218.04. |
| James H. Gilbert, 10/70, | 2016.40. |
| Charles H. Conrad, 2/70, | 403.28. |
| William N. Eisendrath, 7/70, | 1411.48. |
| Calvin M. Favorite, 7/70, | 1411.48. |
| George Woodland, 1/70, | 201.64. |
| Adolph Nathan, 5/70, | 1008.20. |

| | |
|---|---|
| Helen W. Hamilton and | |
| Frank T. Hamilton, Administrators | |
| of the Estate of John M. Hamil- | |
| ton, deceased, 14/70, | 2822.96. |
| Sarah M. Snitzler and | |
| John T. Snitzler, Executors of | |
| the Last Will and Testament of | |
| John H. Snitzler, deceased, 7/70, | 1411.48. |

$12904.96.

12. That on the trial of the cause complainants offered evidence tending to prove that said defendants also knowingly and willfully represented and stated to the investors as an inducement to the purchase, that the property was producing and had for a period of six months prior to December 3, 1904, been producing an average daily output of one hundred barrels of oil, and was adequately equipped with first-class machinery and appliances for handling such product, and also offered evidence tending to show that said representations were false within the knowledge of the defendants, and that the complainants were induced thereby to make the investments aforesaid, and relied upon the truth thereof, and had no reason to suspect their falsity; that the defendants on their part denied the making of such representations and introduced evidence tending to disprove such allegations; that the complainants also introduced evidence tending to show that, relying on the matters last above referred to, they gave due and prompt notice of their election to rescind the said contract and tendered back to the said defendants all that they had received through said purchase; and also introduced evidence tending to show that said notice of rescission and tender was in due time and sufficient.

That the defendants offered evidence tending to show the contrary; that the court, for reasons hereinafter stated, declines to make any finding in regard to the matters in this paragraph before referred to; that the court holds that the said defendants did not occupy the relation of vendors to the complainants, but only

the relation of agents, and for that reason the remedy of rescission cannot be applied, and that the sole remedy of the complainants in a court of equity is the recovery of the secret profits which the said defendants received and improperly retained while acting in the relation aforesaid; that therefore the prayer of the complainants' bill for a rescission of the contract and a return of the whole amount of the purchase money, aggregating $64,000, is denied; that this decree, however, is without prejudice to the right of the complainants to institute proceedings at law to recover damages for the alleged fraudulent representations regarding the product, character and condition of said property; nor is the decree to be taken as a finding for or against either party upon the question of such last mentioned claim for damages in an action at law based upon such alleged false representations.

13. That the equities are in favor of the complainants.

The court therefore decrees: That in addition to the payment of the several sums of money found due from the defendants to the complainants respectively in paragraph 11 of the decree, with interest as provided, the complainants also recover of said defendants the costs of this proceeding to be taxed; that the stock in the said corporation issued to the defendants and each of them be deemed and taken to be fully paid; and that the defendants as between themselves are liable for equal shares of the amounts so recovered by the complainants, and that they may have contribution therefor from one another.

The defendants and each of them appealed from this decree as a whole, while the complainants jointly and severally prayed an appeal, which was allowed them (but which it does not appear was perfected) from so much of said finding and decree as denies the prayer of the complainants for a rescission of the contract of purchase and sale and the recovery of the said $64,000 purchase money.

But in this appeal of the defendants McWilliams and Lord, the complainants have assigned cross-errors covering the points mentioned in their prayer for a cross-appeal, their assignment of cross-error being: "That the court erred in denying the prayer of the bill of complaint for a rescission of the contract and a return of the whole amount of the purchase money, aggregating $64,000, together with interest thereon".

The assignment of errors by the defendants, on the other hand, complains of the relief which was granted to the complainants, alleging any decree against the defendants to be contrary to the law and the evidence. It also particularly attacks the relief granted to the administrators of Hamilton and the executors of the will of Snitzler.

The findings of fact of the decree are also questioned generally.

Specifically the findings are objected to:

1. That the defendants or either of them requested Conrad, Woodland, Hamilton and Snitzler to join with them in the purchase involved.

2. That the defendants represented to any of the investors that the defendants had an option for the purchase of the property involved for $70,000, or that the said sum of $70,000 was the amount which would have to be paid to the owners of said leases, or that the investors were being offered a chance to come into a good thing at the "ground floor" price.

3. That the complainants, other than the representatives of Hamilton and Snitzler, relied upon the truth of any such representations.

4. That said representations were made in the presence of said Hamilton and Snitzler, or either of them, and that Hamilton and Snitzler relied on and believed said representations.

5. That it was agreed between investors and defendants that defendant Lord should take the money contributed by the investors and defendants and examine said property, and if certain representations in said

decree referred to, concerning the production and equipment of the property, were found by him to be true, he should exercise said supposed option of purchase at $70,000, and otherwise return the money to the complainants.

6. That Lord, while effecting the purchase, concealed from the investors all knowledge of the fact that he was interested in making such sale, and that he and his associates would obtain a profit if the property were taken by the investors at the price of $70,000, as aforesaid.

7. That in June, 1905, Gilbert, Hamilton and Maxwell received information which led them to suspect that the price paid for the property had been less than $70,000, and that they thereupon investigated, and in October, 1905, obtained certain knowledge of certain facts set forth in said decree.

8. That the complainants offered evidence tending to prove the representations set forth in the decree, concerning production and equipment of the property, the falsity thereof, the reliance of complainants on the representations, the due and prompt notice, when they discovered the falsity of said representations, of their election to rescind said contract, and the tender to the defendants of all they, the complainants, received through said purchase.

The specific findings of law objected to are those which hold the defendants, McWilliams, Lord and Kimball, under obligation to pay $12,904.06 to the complainants, according to their respective investments, and that which holds that the payment of $4,000 to said company, which was made by the defendant Lord to the corporation in October, 1905, should not be applied on account of his obligation to the complainants as individuals.

HOLT, WHEELER & SIDLEY, for appellants.

TOLMAN, REDFIELD & SEXTON, for appellees.

MR. JUSTICE BROWN delivered the opinion of the court.

It is manifest that the cross-error assigned in this appeal may conveniently be disposed of first, for if, as the learned chancellor in the Circuit Court held in the 12th paragraph of the decree, the prayer of the bill for a decree of "rescission", which should vest in the three defendants the stock in the corporation which holds the leases and interests in lands which were the subject of the negotiations and business arrangements between them and the complainants, and give to complainants a decree against the defendants for all the money the complainants put into the business, with interest, is inadmissible, and the remedy prayed for impossible and inapplicable, the only relief possible on this bill, if its allegations are fully sustained, being the recovery by the complainants of the secret profits which the defendants are alleged to have received and retained in the course of the transaction, then we may properly, as did the chancellor, decline to decide between the sharply conflicting testimony as to the representations made by the defendants to the complainants prior to December 3, 1904, concerning the average daily production of the oil wells in question, or the machinery and appliances with which they were equipped.

On the other hand, should we think that his decision on the possible scope of the relief proper to be granted, if any, is incorrect, the question of these representations would be of very great and probably controlling importance.

On the findings on the issues raised between complainants and defendants on these representations might well depend the question whether the present decree should stand as a sufficient and adequate remedy for the alleged misapplication of funds entrusted by the complainants to the defendants because of the misrepresentations of the latter as to price and equality of standing, or a more drastic and far reach-

ing judgment should, without reference to any possible hardships to defendants, replace the complainants in the situation in which they were before the purchase of the oil leases by the syndicate which afterward developed into the H. G. & M. Oil Company.

Counsel for the complainants' argument on the cross-errors is made chiefly, if not altogether, on the theory that the defendants in fact and certainly in the view of equity, sold to complainants certain interests in lands, which the defendants had exercised an option previously held by them, to purchase; that this sale was effected through various fraudulent misrepresentations, and may and should be set aside, and the defendants and complainants put in as nearly as possible the position they occupied before the sale, which would leave, according to the theory of complainants, the defendants the owners of all the stock of the H. G. & M. Oil Company, and the complainants the possessors of the money they parted with in the venture which they now regret. It is true that the counsel for complainants say that the establishment of this relation of vendors and vendees, which they insist existed between defendants and complainants, is not necessary to their right to a ''rescission'', but we are not convinced by their argument. If this relation did not exist, then the ''rescission'' in question—on the assumption that the misrepresentations which would justify it have been proven—would be, as the chancellor in his opinion said, ''to compel the defendants to stand in the shoes of the syndicate because of their wrong doing''. It was not presumably because ''of tender consideration for the consequences which would be visited on the defendants'', as complainants' counsel suggests, that the chancellor found that this would be an improper thing for him to do, on the assumption that he should find for the complainants on all the controverted issues of fact, but because he thought—as we do also—that a court of chancery has no right, under the mask of a legal fiction of rescission, to

punish fraud. If "compensation has no place in the law of rescission" (Smith v. Brittenham, 109 Ill. 540), certainly punishment cannot have. Undoubtedly transactions other than sales, being vitiated by fraud, may be cancelled or set aside or held for naught, but "rescission" of a contract of sale has a defined technical meaning, and we are of the opinion that it cannot be decreed in the case at bar unless it is held that the theory of the complainants is correct that for practical and equitable purposes the defendants were at one time the owners of the oil leases which are now the property of the H. G. & M. Oil Company.

But we are no more able so to find than was the chancellor. This is not the theory of the amended bill on which the decree was rendered, nor is it the fact shown by the evidence. The allegations of the bill are that the defendants requested the complainants "to join with the defendants in the consummation of an option" and "in the formation of a corporation which should receive assignments of the leases", and that after and in consequence of certain representations the complainants paid to the defendants (or to Lord as their representative) certain sums of money, and that Lord took the money and procured from the owner of the leases an assignment to the corporation which had been, in accordance with their suggestions, organized.

The evidence presented by the complainants bears out the allegations, and it is on this different theory that the complainants' counsel rests their argument in defense against appellants' attacks of the decree which was entered.

In the contest over the errors assigned by the defendants, the position of the defendants is that while not vendors of the oil leases or interests in the lands to the complainants or to the corporation, they were vendors, dealing at arm's length and on lawful principles with the complainants, of an option to buy these oil leases from Tait; that as owners of that option they

sold it at a legitimate profit of $12,500 to the syndicate composed of the complainants and themselves, which afterwards developed into the H. G. & M. Oil Company. The complainants' position, however, on these assigned errors is (as we cannot but view it, despite the disclaimers of their final reply brief) that the chancellor correctly decided that the defendants were neither "vendors" of oil leases or lands to the complainants, nor "vendors" of an option to purchase oil leases or lands to them, but persons who as "promoters" induced the complainants, in conjunction with themselves, to exercise the option which they (the defendants) held, and having, by false representations, while in a fiduciary relation of agency, obtained from these complainants a larger amount of money than was necessary to consummate the option, divided the excess among themselves in violation of their duty and of the trust reposed in them.

If the evidence bears out this latter position, the complainants are entitled to relief—not the relief of rescission or cancellation of a contract or of a sale, but the recovery of misused and misappropriated trust funds. This is the relief the chancellor thought the complainants entitled to and the relief which he gave them, preserving expressly to them the right to pursue at law (since the purchase which they made—involving an innocent vendor as it did—could not be rescinded or set aside) the agents or promoters charged with deceiving them as to the character of the property bought, as well as to its price, for a recovery of any further damage the purchase may have caused them.

We think that even on the assumption that everything in the way of false representation of production and equipment which the complainants charge was proved by the evidence to the satisfaction of the chancellor and of ourselves, neither he nor we could, under the law and evidence in this case, do more, and therefore we shall dismiss from consideration in this opin-

ion the conflicting and varying testimony concerning these representations and the elaborate, ingenious and very extended arguments in which the respective views of counsel are presented regarding them.

There is, however, no such assumption of our belief in the charges of misrepresentation of production and equipment to be made. Like the chancellor below, and for the same reasons, we decline to make any finding in regard thereto. Nor do we wish to discuss the testimony regarding them. It would be useless for the present purposes and injudicious if there should be a suit at law growing out of them.

The disposition of the cross-error assigned, however, leaves us to pass on the objections made in the defendants' assignment of error to the findings of fact and law in the decree.

The findings of fact have been most elaborately and exhaustively discussed by counsel, the testimony having been analyzed by them from every point of view. We have as diligently and thoroughly examined it all as though it had been primarily presented before us, as it was our duty in an equity appeal like this to do.

But it is to be remembered, nevertheless, that the evidence was, as is conceded, sharply conflicting, that the cause was tried before the chancellor on oral testimony chiefly, and that therefore on questions depending on conflicting evidence and the credibility of witnesses, the finding of the chancellor should be upheld by us unless it appears to us clearly against the weight of the evidence.

Judge Bailey said in Metcalfe v. Bradshaw, 145 Ill. 133: "So far as the testimony of these witnesses is at variance, all we need say is, that the court saw them and heard them testify and from all the evidence found the equities of the case to be with the defendant. That finding, so far as we can see, is entitled to the credit which is ordinarily given to the finding of a court of chancery, where the evidence is given orally in open court, and on appeal it must be accepted as

conclusive, unless it clearly appears to be against the weight of the evidence''.

And Judge Magruder said in Blomstrom v. Dux, 175 Ill. 435, citing several prior cases to sustain his position: ''The chancellor heard the testimony of the witnesses, observed their capacity and manner of testifying and could judge of the credibility of the witnesses and the weight of their evidence better than an appellate court, which sees only the cold record. Under such circumstances, the finding of fact made by the chancellor will not be disturbed unless it is manifestly against the weight of the evidence''.

We are not unmindful of the rule invoked earnestly by the counsel for defendants, that fraud and fraudulent conduct should not be presumed nor lightly inferred, but made clear by the evidence. But in reviewing the decision and finding of a chancellor who has found the evidence sufficiently clear and unambiguous to justify his decree, we are still bound by the principle above stated, and to justify our interference it must be manifest to us from the evidence that it could not have been properly held that the ground for relief was clearly proven.

We must remember too that, as the Supreme Court of the United States has said in a case relied on by the defendants, that although the evidence must be clear, satisfactory and persuasive to prove fraud, it may be circumstantial. Lalone v. United States, 164 U. S. 257.

We are unable to say that it is manifest to us from the evidence before us in this case that the contentions of the complainants, or any one or more of them, as to the representations of the price that would have to be paid by the defendants for the oil interests in question, in buying them for the syndicate, were not sustained.

On the principle that the chancellor was, from his position, the best judge of credibility in case of direct contradiction, it cannot be said that the evidence

lacked sufficient clearness in this regard. Without the denials of the defendants—which the chancellor, in view of all the evidence, weighed and rejected—there could certainly not be a doubt that the evidence that the defendants said to the complainants, or to most of them, that they had an option for $70,000, was neither "vague" nor "ambiguous".

But still more clearly, if that were possible, does it appear to us that if the credibility of contradictory witnesses is to be left to the chancellor, nothing can be urged against the clearness and definiteness with which the evidence establishes the fact that the defendants represented that "the investors were being offered a chance to come into a good thing at the ground floor price". (Fourth paragraph of the Decree.)

This latter proposition is the core of the whole matter. It applies as well to the complainant Nathan as to the others, who swore that they never heard of the "small commission" that Nathan says McWilliams told him he expected to get. It applies to Conrad and Woodland, to whom the representations of McWilliams were repeated by Maxwell. It applies to Hamilton and Schnitzler, whose actions were consistent only, as it seems to us, with the belief that it also seems to us plain the other investors had, that they were going in practically "on the level", and that this meant in proportionate parts of a purchase price of $70,000. To go over the testimony in detail, to discuss and analyze it from our point of view, as it is discussed and analyzed in the arguments of counsel from theirs, would, as we have had occasion to say in similar cases, undoubtedly be unnecessary for one party and unconvincing to the other. It would therefore serve no useful purpose. But taken as a whole, particularly when leaving direct questions of conflicting credibility to the chancellor, the evidence seems to us, as clearly as it did to him, to establish the proposition that the "investors" all believed, and by the words and actions

of the defendants were led to believe, and from them had a right to believe, that they were "in on the ground floor" with the defendants, that they were partnership or syndicate associates "in a good thing", in which they were all interested in the same manner, and without profit to any which the others did not share. If Nathan's knowledge or notification that Mc-Williams was expecting "a small commission", "an ordinary brokerage", as he calls it, was an exception to this, nevertheless the additional profit which Nathan thought or was given to understand that McWilliams was expecting, was a very different "profit" from that taken by McWilliams and the other defendants and now claimed by them to be the legitimate result of the sale of the option to the syndicate as "arm's length" vendees at an advance of more than twenty per cent.

Not only the testimony concerning what was said, but the evidence of what was actually done and the manner in which it was done, the actions of the various parties at, before and after the payment of the money all seem to us consistent with the theory that the investors thought, that the defendants knew they thought, and allowed them to think, contrary to the fact, and indeed induced them, by their speech and actions (whatever the exact words used may have been), to think, that the syndicate were all proportionate partners, without any special or peculiar advantages to the defendants in their purchase.

It is, in connection with the other evidence, an entirely fair inference, from the selection of Mr. Lord to make the examination of the property to ascertain or verify its productivity and equipment, that those present at the meeting of December 3rd, except Mc-Williams and Kimball, had no knowledge or suspicion that Lord was to be a special beneficiary to the extent of $4,000 and more if the sale went through, but was to get none of this profit if the property was rejected. It is also a fair inference that Lord, when accepting the duty confided to him, must have been fully aware

that it would not have been so devolved on him had the actual facts been known. Business men do not act that way. It is the oldest of maxims that no man is a proper judge in his own case, on the determination of which he is to reap or lose a profit. Had Mr. Lord then intended or wished that the syndicate should be fully and fairly advised of the matters on which they were acting, he would have declined the appointment, told them that they had unwittingly selected the wrong man, exposed then the profit that he and his associates were expecting to make, and abided the result. Such would have been the natural action even of persons dealing at arm's length, when the other party plainly showed that he was laboring under a misapprehension.

If we accept the findings of the chancellor as to the facts, it only becomes necessary to determine how the law should be applied to them. The chancellor did it in the most obvious manner to secure the natural and proper relief for the complainants, by making a money decree against the defendants in favor of each complainant for the portion of the additional cost to him of his holding which resulted from the illegitimate secret profit, providing for contribution among the defendants so that each should be obliged to refund what he actually secured of this profit, and leaving to the complainants, for any other claims for damages for misrepresentations and deceit of which they may be advised, their action at law. We think this method equitable and logical and in accordance with correct principles of chancery jurisdiction.

The first objection to it made by the defendants was that, assuming the facts to be correctly found by the court, "rescission, which was the only relief sought by the bill, having been denied on the facts, the court acquired no jurisdiction of the case on any equitable ground, and should have remitted the parties to the law for the relief by way of repayment of profits which was not prayed in the bill, was not incidental to the

real relief sought, and for which an action at law afforded a full and adequate remedy''.

We understand this position to be definitely abandoned by the counsel for appellants in their later argument, in which they say: ''In order that this court may not be misled, as we have been, into thinking that this bill is one for rescission, by reason of its *prayer* for that relief, and for that specific relief only, we point out  *  *  *  that a careful examination of the bill fails to disclose a single allegation of fact showing a sale of oil properties or of stock by defendants to complainants.  *  *  *  The examination of the amended bill, apart from its specific prayer, convinces us that in its allegations of fact it proceeded upon a theory of joint purchase in line with the chancellor's decree, and that the relief actually granted was covered by the prayer for general relief upon the facts, though wholly inconsistent with that specifically asked and therefore in no way incidental to it. *We do not therefore further urge a dismissal of the bill upon the mere question of pleading, that the decree entered was not justified by the allegations of the bill''.*

If this last sentence is not, however, to be construed as wholly abandoning the position previously taken and hereinbefore quoted, we have no hesitation in saying that we think the characterization of the bill in the later excerpt from defendants' argument is accurate, and that for the reasons therein set forth the objection made that the relief granted was neither specifically prayed, nor within the frame of the bill, fails of all force. It was not specifically prayed, because the prayer did not fit the allegations of the bill. It was properly granted under the prayer for general relief, because the facts set up in the bill plainly pointed to it, and showed it both to be the proper measure of relief and the only relief possible in this proceeding.

The learned chancellor expressed in his opinion some doubt whether equity was the proper forum for the recovery which he granted, but we do not share it.

While it is true that under the law of Illinois a mere bailment will not raise a trust cognizable in equity, we think it is recognized by the decisions in Illinois, as elsewhere, that syndicate or association subscriptions to purchase land or interests in land, or perhaps any other purchasable commodity, establish, if not a partnership, at least such fiduciary relations between the associates as impose a trust character on funds confided by the others to the purchasing agents, and entitle them to ask in equity an accounting and the restoration of money improperly diverted from its intended purpose. McDowell v. Joice, 149 Ill. 124; Bunn v. Schnellbacher, 163 Ill. 328; Salsbury v. Ware, 183 Ill. 505.

Nor do we think the further argument forceful, that the decree in any case should be restricted to Lord, who was alone the agent in the disbursement of the money and who alone therefore improperly received and improperly diverted the money of the associates.

It would be a halting jurisprudence which did not give against the two other associates who were in the secret with Lord, who were cognizant of his plan and took an equal portion of the profit, the like remedy given against him, simply because he was given the physical control of the funds. If on no other ground, the trust character of the funds in Lord's hands, given to him for one purpose and partially diverted by him to another, authorizes a court of equity to follow the diverted moneys into the hands of persons taking it with notice that, not being required for the purchase of the oil leases, it belonged to, and should have been returned to, the investors.

On the other hand we do not regard as any better taken the point made in favor of Lord, that as he has paid $4,000 into the treasury of the H. G. & M. Oil Co., under the belief that he was thereby doing all and more than all that could be properly asked of him, he should not be decreed to pay a similar sum to the complainants, especially as a part of it is to be paid

to complainants who acquiesced in and, as it is claimed, approved and encouraged, the payment to the corporation.

The question is not one of Mr. Lord's belief or intentions when paying the money in question. If he paid it into the treasury of the corporation under a mistaken view of his legal obligations, or without such a mistake, purely as a gratification to his sense of business honor, or with the hope and belief that it would remove irritation and resentment, well or ill-founded, against him in the minds of those with whom he desired to live in friendship, he must take the consequences of his voluntary act, modified only by the right, expressly reserved to him by the decree, to test whatever right he may have at law or equity to recover from the corporation the sum paid to it.

The corporation is a distinct entity. It was organized after the transactions which are the subject of this suit, although it was then in prospect. But it was the complainants who were primarily and directly injured by the unwarrantable conduct of the defendants, not the corporation. The right of action here enforced rested with the complainants individually, and not with the corporation. Payment to the corporation did not and could not release it.

Nor, in our opinion, is there any estoppel shown in the evidence against Maxwell's or Gilbert's recovery from Lord as from McWilliams and Kimball their portion of the diverted funds. They did not object to Lord's payment to the corporation; they indeed reservedly commended it. But they did not propose it, urge it, or recur to it after the interview in which Lord stated his intention. They expressly demanded other and much farther-reaching action of a very different sort—action the right to which in this cause has been refused them. We do not think they can be held to have estopped themselves from securing the relief which has been granted them, by not constitut-

ing themselves advisers and counsellors of Lord to caution him against a contemplated voluntary action which they did not regard as satisfying his obligation to them.

As we have before indicated, the decree of the Circuit Court commends itself to us as the logical and proper one on this record, and it is accordingly affirmed.

*Affirmed.*