LATIMER *v.* PIPER.

1. JOINT ADVENTURES—CORPORATIONS.
   Where purpose of parties was to carry out single business enterprise for profit, it was joint adventure, although corporation was used as medium for carrying it out.

2. SAME—RESCISSION—TENDER—FRAUD—STATUS QUO.
   On rescission for fraud, it is necessary, as rule, to tender back property received in exchange for consideration sought to be recovered, so as to restore original *status quo,* and when parties seeking relief cannot make restitution, through their own acts or fault, rescission is generally denied.

3. SAME—TENDER BACK OF STOCK.
   In suit for rescission, on ground of fraud, of contract for joint adventure, where corporation was used as medium for carrying it out, *status quo* was sufficiently restored by tender back of shares received.

4. PARTIES—JOINDER OF PLAINTIFFS.
   Where interests in subject-matter and issues are same, and relief sought similar, all of plaintiffs may join in one action.

5. SAME—NONJOINDER OF NONRESIDENT DEFENDANTS.
   In suit for rescission of contract for joint adventure, objection that there was nonjoinder of defendants, not raised in lower court, *held,* not necessary to decision; persons not joined not being residents of State.

6. JOINT ADVENTURES—FIDUCIARY RELATION.
   Law requires highest degree of integrity, full disclosure, and fairness be maintained among coadventurers; relation in venture being largely fiduciary to one another.

As to what amounts to a joint adventure, see annotation in 48 A. L. R. 1055, 1056; 63 A. L. R. 910.

As to effect of secret advantage to one of several joint purchasers, see annotation in 43 L. R. A. (N. S.) 934.

(123)

7. SAME—SIMILAR TO PARTNERSHIP.

There is little difference between joint adventure and partnership in respect to fiduciary relation of parties.

8. SAME—SECRET PROFIT.

One adventurer may not seek to reap profit at expense of other; relationship forbidding existence of secret advantage by one over other.

9. SAME—FRAUD—RESCISSION—TENDER.

Joint adventurers, on discovering that they had been defrauded through medium of corporation, had right to rescind on tendering back stock received, and look for repayment to coadventurer on whose integrity they relied.

10. SAME—OPTIONAL REMEDIES.

Joint adventurers, on discovering that they had been defrauded, had choice of remedies, including right to bring suit in equity for recovery of their investment on tendering restoration of what they had originally received.

11. SAME—RESCISSION.

Rescission may lie even though defendant was not full owner of property and did not receive entire consideration.

12. SAME—FRAUD—DAMAGES RECOVERABLE AGAINST COADVENTURER.

Where, in purchase of hotel property fronting on lake, coadventurer misrepresented price to be paid and also amount of lake frontage, coadventurers so defrauded had right to recover from coadventurer on whose integrity they relied their losses and expenses, including amount advanced for improvements to property purchased.

Appeal from Muskegon; Vanderwerp (John), J. Submitted June 16, 1932. (Docket No. 47, Calendar No. 36,489.) Decided January 3, 1933.

Bill by Charles H. Latimer and others against Hilton A. Piper for rescission of a joint venture and for an accounting. From decree rendered, both parties appeal. Modified and affirmed.

*Butterfield, Keeney & Amberg* (*Julius H. Amberg* and *Harry Shulsky,* for plaintiffs.

*Alexis J. Rogoski* and *Norris, McPherson, Harrington & Waer*, for defendant.

BUTZEL, J. In the spring of 1927, Donald M. Ward, who had formerly been engaged in selling Florida resort property, became interested in the Long Point Hotel property at Mullett lake, in Cheboygan county. He associated himself with Donald V. Barker of Grand Rapids, an automobile sales agent, with whom he had had previous dealings. They interested defendant Hilton A. Piper of Muskegon, and the three together, taking advantage of Piper's wide acquaintance in Muskegon, sought to interest a number of its prominent residents. They represented that the Long Point property could be purchased for $60,000; that the property consisted of the hotel and the lake frontage on which it was situated, considerable acreage nearby with a high elevation overlooking but not bordering the lake, and also additional lake frontage, some 2,000 feet in length, that could be subdivided and sold to great advantage. They sought to form a syndicate or a joint venture to purchase this property from its owners. They proposed to sell six units of $10,000 each, amounting to $60,000, which they represented to be the cost of the property. Defendant Piper stated that he would invest $10,000 for one unit, that one Paul R. Beardsley would invest a like amount, and urged the others to do likewise, even going so far as to tell some of them that he would insure them against loss.

Plaintiff Charles H. Latimer and his wife, Alice, accompanied by Ward and Barker, visited the property. A long strip of lake frontage was pointed out to them as belonging to it. Moving pictures were taken and later exhibited to the other plaintiffs, and

also to Piper, who had not accompanied them. A syndicate was subsequently formed, Latimer contributing $10,000, Mrs. Latimer, $2,000, William H. Wilson, $10,000, Frank E. McKee, $10,000, and Charles W. Porter, $8,000, making a total of $40,000 of the $60,000 that defendant and his associates represented as the purchase price. Mr. and Mrs. Latimer, Wilson, McKee, and Porter are the plaintiffs herein.

Defendant represented, and still claims, that he invested $10,000 in the enterprise, and that Beardsley also paid a like amount. Ward and Barker were to receive 40 per cent. of the profits made by the syndicate in return for the option that they had secured on the property and for promotion, sales services to be rendered, etc. When the deal was consummated, only $40,000 was forthcoming. Defendant was asked about the amounts that he and Beardsley were each to pay. He replied that he would take care of these payments. Defendant claims that he paid $10,000 in currency to Barker in front of a Grand Rapids brokerage office; that he received the money in bills from his brother Claude, who testified that he had kept this large amount on his person rather than deposit it in the bank, because he feared that the bank would apply the amount, if deposited, towards the payment of his loan. A clergyman who, defendant claims, was present when Claude paid the money, was not called as a witness for reasons that do not appeal to us.

Defendant claims that he paid the money to Barker prior to the closing of the deal; that Ward, without the knowledge of plaintiffs, gave him a note to indemnify him against any loss he might suffer should the enterprise be unsuccessful. Defendant produced a receipt written in pencil by Barker, but

its physical appearance aroused suspicion at the trial. A very intimate friend of defendant also testified that he was present when a large amount of money was handed Ward by Barker with the statement that it came from Piper.

The testimony shows that only $40,000 was paid to the vendors of the property; that in addition thereto Ward, Barker, and defendant gave one of two notes for $2,500 to the former owners in order to purchase additional upland acreage to substitute for the long strip of lake frontage. All knowledge in regard to this note and the absence of the additional lake frontage was withheld from plaintiffs. Defendant claims at the time he signed the note he neither knew for what purpose it was given nor that there was not the lake frontage as represented. The option to purchase for $40,000 ran not only to Ward and Barker, but also to defendant, who retained a copy.

The record does not clearly show the previous ownership of the property. The Long Point Hotel Company was a corporation in which parties by the names of Fuller, Connine, Aldrich, and Batdorf were stockholders, owning $40,000 worth of stock, all that had been issued of a total capitalization of $100,000. They are in no way involved in this litigation. The 45 acres of upland property also belonged to one of them. Fuller signed the option running to Ward, Barker, and Piper, in which he agreed to sell them the issued stock for $40,000, and to deed to them, for the $2,500 note, 45 acres of property which the optionees were substituting, without plaintiffs' knowledge, for the missing lake frontage. When the deal was closed, the former owners transferred the $40,000 of issued stock to Ward, Barker, and Piper, who became the owners of all of the capital

stock of the company, by virtue of a later transfer of the remaining 6,000 shares.

An able lawyer, who took the money put up by plaintiffs to the bank, where the stock had been placed in escrow, remarked that the deal seemed peculiar. When it was closed Piper took possession of all of the corporate books and papers. Shortly thereafter, another lawyer of high standing drew minutes for a corporate meeting, but the record leaves considerable doubt as to whether it ever actually took place. The minutes show that $60,000 of the treasury stock was issued to Ward, Barker, and Piper in consideration of the transfer to the corporation of the additional acreage purchased with their $2,500 note. The $40,000 issued stock transferred to them, together with the $60,000 treasury stock, was so distributed as to create a set-up in which Piper held 1,000 shares, Beardsley 1,000, the plaintiffs 4,000, and Ward and Barker the remaining 4,000. Plaintiffs' shares were a part of the block of 6,000 shares of treasury stock.

Latimer was elected secretary of the corporation, and some time later, with some of the other plaintiffs, signed the minutes, but paid no particular attention to their contents. They had been drawn by an able attorney so as to show the issuance of the entire $100,000 of stock, and the election of the new officers and directors upon the resignation of the former ones. All of the former owners' stock had been purchased with the $40,000 furnished by plaintiffs, who believed that $60,000 had been paid for it. It was agreeable to them that $40,000 in stock should be turned over to Ward and Barker in consideration of their option and the services they were to render to the corporation. While the minutes of the corporation indicate that the stock turned over to plain-

tiffs was treasury stock, it was stock in a corporation of which Piper and his conspirators had for the time being become the sole owners by purchase with funds obtained from plaintiffs through misrepresentations. The most that the corporation received for its $60,000 of stock was additional acreage for which Piper, Barker, and Ward had given their $2,500 note. The corporation was not a party to the fraud. Plaintiffs made their investment as joint adventurers with Piper and Beardsley in the belief that $60,000 was being paid into a company that owned a long strip of lake frontage, as was fraudulently represented to them.

Beardsley, who is not a party to the litigation, claims he gave his note for $10,000 to Barker for stock received from him. The proceeds of the note to Barker were not turned over to the sellers or to the corporation, but were kept by Ward and Barker, with the exception of $1,000 which they paid to Piper and one Wilcox for an option on some Manistee county property given by them to Ward and Barker.

The whole project proved a dismal failure. Plaintiffs and defendant advanced large sums of money in addition to their original investment and also became several guarantors on a bond issue that was placed upon the property. In 1928, plaintiff Porter, while checking up the taxes, found that only one lot fronted on the lake. When this was brought to the attention of defendant, he expressed surprise and claimed that he had also been deceived. Subsequently, when it was realized that the Mullett Lake property could not be profitably managed and sold, it was by appropriate corporate action exchanged for an equity in some Chicago real estate, that the corporation thus acquired. Shortly thereafter, this

equity was also wiped out. Plaintiffs still had the stock certificates that they originally received and also a large contingent liability.

In 1930, plaintiffs learned for the first time that Piper had deceived them. He went to see Porter in regard to the $2,500 note given by Ward, Barker, and himself for the purchase of the acreage, payment for which was being pressed. He desired to make a counterclaim on account of the shortage of frontage property. He then for the first time not only disclosed the fact that he had given the note, but he also exhibited the copy of the option running to himself, Ward, and Barker, calling for a purchase price of $40,000, instead of $60,000. When Porter began to make memoranda, Piper hastily snatched the option from the desk and walked out. Plaintiffs met defendant shortly thereafter. The latter gave unsatisfactory and evasive replies as to the $2,500 note and the option and claimed he had never read the option, although he had had it in his possession for a long time. Very shortly thereafter, plaintiffs rescinded and tendered their stock certificates to defendant, and brought the instant suit for rescission. They claimed fraud, and asked for repayment of all amounts paid by them in cash, both towards the syndicate and the maintenance of the property, and indemnity for any sums they might be called upon to pay on account of their several guaranty of a bond issue that had been placed on the lake property. Defendant attempted to prove that he had actually paid in the $10,000, and had been deceived by Ward and Barker.

The issues of fact are sharply drawn. Ward, in a deposition, testified for plaintiffs and disclosed the entire transaction. Even without his testimony, we are satisfied that the judge, who had the addi-

tional advantage of seeing all the other witnesses, was amply justified in finding that defendant was a co-adventurer of plaintiffs, notwithstanding the fact that a corporation already in existence was used to carry out the project. He found that defendant made material false representations upon which plaintiffs relied in going into the enterprise. He decreed rescission, and ordered defendant to repay to plaintiffs all moneys invested by them in the first instance, and further, that defendant indemnify them for any loss that might arise out of their several guaranty of the bond issue placed upon the property. He refused to hold defendant liable, however, for the moneys advanced to the corporation. Defendant appeals from the decree, and plaintiffs from that part of it which does not provide for a return of the moneys advanced by plaintiffs to the corporation. Space will not permit a statement of many other material facts.

Having arrived at the conclusion that the plaintiffs have sustained the burden of proving defendant guilty of fraud, we are confronted with a number of other questions that we will discuss *seriatim*.

It is claimed that each of the plaintiffs bought a certain amount of stock in a company and that it was not a joint venture. The testimony shows that the purpose of the parties was to carry out a single business enterprise for profit and that it was a joint venture. See *Keiswetter* v. *Rubenstein*, 235 Mich. 36 (48 A. L. R. 1049), in which *Fletcher* v. *Fletcher*, 206 Mich. 153, and *Alderton* v. *Williams*, 139 Mich. 296, are referred to. See, also, *Lane* v. *Wood*, 259 Mich. 266.

We are satisfied that the corporation was merely a medium for carrying out the joint venture, and that plaintiffs were not interested in purchasing stock

in a corporation, but desired only to acquire the property together by the use of this convenient medium, each person taking a unit. The case of *Turtur* v. *Isserman*, 2 N. J. Misc. 1084 (128 Atl. 151), holds that although the employment of the corporate mechanism and the issuance of stock might, on its face, seem to preclude joint ownership, it does not necessarily negative the existence of a joint adventure when such was the manifest purpose of the parties. In *Maxwell* v. *McWilliams*, 145 Ill. App. 155, where the facts are somewhat analogous to those in the case at bar, plaintiffs. were allowed to recover for secret profits, but relegated to a court of law to recover the other damages claimed. Rescission was denied. We believe, however, that the correct principle is stated in *Sim* v. *Edenborn*, 242 U. S. 131 (37 Sup. Ct. 36), from which we quote as follows:

"Through misleading misrepresentations and suppression of facts, respondent induced syndicate subscribers to become parties to an agreement creating him their agent to acquire and deal with certain properties—a position of especial trust and confidence. His original undisclosed purpose was to obtain their money and appropriate it toward the purchase of something partly owned by himself. Having led them to intrust their funds to his discretion, he carried out his preconceived plan, and as a part of it caused them to receive an equivalent amount of corporate stock. He now seeks to avoid a judgment, because his own actions have rendered it impossible for him to get back to the beginning point."

The syndicate subscribers were allowed to recover what they paid. This was in accord with the decision in *Heckscher* v. *Edenborn*, 203 N. Y. 210 (96 N. E. 441). See, also, *Munson* v. *Fishburn*, 183 Cal. 206 (190 Pac. 808).

On a rescission, it is necessary, as a rule, to tender back the property received in exchange for the consideration sought to be recovered, so as to restore the original *status quo,* and when the parties seeking relief cannot make restitution, through their own acts or fault, rescission is generally denied. See *Bowen* v. *Stocklin,* 215 Mich. 341; *Papciak* v. *Morawski,* 243 Mich. 157; *Augustyn* v. *Zawacki,* 250 Mich. 218. It is claimed that rescission cannot lie here because the Long Point Hotel property has passed out of the hands of the company, thus making it impossible to restore the *status quo.* The exchange for the Chicago property was made with the full consent of defendant. Although plaintiffs originally intended to purchase an interest in the property, all that they ever received and could return were the shares of stock. Had they disposed of these shares, they would be estopped from rescinding, but they tendered back the shares they had received. A somewhat analogous situation arose in *Sim* v. *Edenborn, supra,* wherein the court held that the loss should fall on the unfaithful agent, not on his too-confiding principals. In *Munson* v. *Fishburn, supra,* land held by a syndicate was exchanged for stock in a company to which property was transferred. It was held that the *status quo* was restored sufficiently by a tender of the shares. Also see *Schultz* v. *O'Rourke,* 18 Mont. 418 (45 Pac. 634); *Ginn* v. *Almy,* 212 Mass. 486 (99 N. E. 276).

We do not believe that there has been a misjoinder of plaintiffs or nonjoinder of defendants in the present proceedings. Each one of the plaintiffs is entitled to the same relief in equity. The representations were identical, whether made to plaintiffs jointly or severally. When the interests in the subject-matter and the issues are the same, and the

relief sought similar, all of the plaintiffs may join in one action. *Hamilton* v. *American Hulled Bean Co.*, 143 Mich. 277. It is claimed, however, that there was a fatal nonjoinder of defendants. This point was not raised in the lower court, and a discussion of it is not necessary to the decision. See, however, *Weber* v. *Weber*, 47 Mich. 569; *Patterson* v. *Railway Co.*, 54 Mich. 91. The record shows that neither Barker nor Ward resided in Michigan. The corporation itself was not a necessary party, as there is no claim for relief made against the corporation. The case of *Dutton* v. *A. W. Wallace & Co.*, 242 Mich. 481, relied on by defendant, is not applicable. Neither the original owners nor the corporation had participated in the fraud.

The law requires that the highest degree of integrity, full disclosure, and fairness be maintained among coadventurers. Their relationship in the venture is largely fiduciary to one another. Principles governing the reciprocal duties between parties dealing at "arm's length" are inapplicable when a relationship based upon mutual confidence is entered into. There is little difference between the joint adventure and the partnership in this respect. One adventurer may not seek to reap a profit at the expense of the other. The very relationship forbids and negatives the existence of any secret advantage possessed by one over the other.

Plaintiffs, immediately upon discovery of the fraud, tendered back to Piper the only thing they received for their investment—the certificates of stock. They had a right to rescind and to look for repayment to Piper, upon whose integrity they relied. See *Crowley* v. *McCullough*, 254 Mich. 362. Plaintiffs had a choice of remedies, including the right to bring a suit in equity for a recovery of

their investment upon tendering a restoration of what they had originally received. *Franey* v. *Warner,* 96 Wis. 222, 235 (71 N. W. 81). This decision, relied upon by defendant, denied rescission, but conceded it would lie were a fact situation presented analogous to that in the instant case. Rescission may lie even though defendant was not the full owner of the property and did not receive the entire consideration. *Heckscher* v. *Edenborn, supra; Sim* v. *Edenborn, supra.* There was a misrepresentation as to price paid for the property. *Crowley* v. *McCullough, supra; Menefee* v. *Oxnam,* 42 Cal. App. 81 (183 Pac. 379); *Noble* v. *Fox,* 35 Okla. 70 (128 Pac. 102, 43 L. R. A. [N. S.] 933). There was misrepresentation as to the amount of property fronting on the lake. *Mann* v. *Pearson,* 249 Mich. 211. The suit was promptly brought, and equity had jurisdiction and will retain it so as to fully indemnify plaintiffs for their losses and expenses. *Laubengayer* v. *Rohde,* 167 Mich. 605; *Johnson* v. *Campbell,* 199 Mich. 186.

The decree of the lower court is affirmed, except that it be modified so as to include the further provision that defendant be decreed to pay plaintiffs who have also appealed, the aggregate amount that they paid to the corporation for improvements on the property. Plaintiffs will recover costs.

McDONALD, C. J., and CLARK, POTTER, SHARPE, NORTH, FEAD, and WIEST, JJ., concurred.