[Civ. No. 2913. Second Appellate District, Division Two.—July 5, 1919.]

## A. B. MENEFEE et al., Appellants, v. MAMIE OXNAM, as Executrix, etc., Respondent.

[1] JOINT ADVENTURERS—RELATIONSHIP OF PARTIES—CONCEALMENT OF PROFITS.—The relation between joint adventurers is fiduciary in its character, and the utmost good faith is required of each in his dealings with the others. Each will be held strictly to account to his coadventurers, and he will not be permitted to enjoy any unfair advantage, or any greater rights than he and his coadventurers are entitled to under the terms of their agreement or understanding. A coadventurer may not conceal his interest or his profits from his associates in the enterprise.

[2] ID.—PURCHASE OF PROPERTY—SECRET ADVANTAGE—CONSTRUCTIVE FRAUD—RIGHTS OF COADVENTURERS.—The failure of one of several joint adventurers, in an enterprise looking to the purchase of property, to share with his coadventurers any secret advantage given by their vendor for inducing the purchase by the other coadventurers is such a breach of confidence as amounts to constructive fraud, and will entitle his coadventurers either to rescind the contract, or to maintain an action for damages for fraud and deceit against either or both parties to the secret understanding, or to have the coadventurer receiving the benefit account to his associates in the enterprise.

[3] ID.—SALE OF INTEREST IN MINE—SECRET AGREEMENT BETWEEN VENDOR AND ONE JOINT ADVENTURER — CONDITIONAL PURCHASE — DISCOVERY OF FRAUD—RESCISSION.—Where, in connection with the sale of an undivided interest in a mine which was to be worked by the purchasers as active partners, one of the joint adventurers, to whom the other joint adventurers, in reliance upon his honesty and upon his becoming interested financially with them in the purchase, had left all the details leading up to the contract of purchase, entered into a secret side agreement with the vendor, whereby the latter agreed that should the mine not produce sufficient profits to pay such joint adventurer's part as provided in the contract of purchase, he should have the right to reconvey his interest to the vendor and be released from payment therefor, the other joint adventurers, upon discovering such

1. Mutual rights and liabilities of parties to joint adventure, notes, 17 Ann. Cas. 1022; Ann. Cas. 1912C, 202; Ann. Cas. 1916A, 1210.

Effect of secret advantage to one member of a joint adventure, note, 50 L. R. A. (N. S.) 1046.

fraud upon them, were entitled to rescind their contract with the vendor as an aider and abetter in the consummation of the fraud.

[4] ID.—BREACH OF FAITH—ACTION TO RESCIND—INJURY—PLEADING AND PROOF.—While it is a general rule that fraud without injury is not ground for relief, either in law or equity, in actions of this character it is not necessary that the parties complaining of the breach of faith on the part of their coadventurer should allege or prove that they have actually been injured by his breach of their confidence.

[5] ID.—ENDEAVOR TO COMPROMISE CLAIM — NOTICE OF RESCISSION — SERVICE WITHIN REASONABLE TIME.—Where such coadventurers, after learning of the fraud practiced on them by their coadventurer and the vendor, entered into negotiations, extending over a period of about seven weeks, with the executrix of the will of said vendor and her legal advisers, in an endeavor to effect a settlement or compromise of their claim before serving notice of rescission of the contract, such notice was within a reasonable time.

[6] ID.—INABILITY OF VENDEES TO RETURN SPECIFIC PROPERTY—MONETARY COMPENSATION—WHEN OFFER TO RETURN UNNECESSARY.— Where, in an action of this character, a return in specie of all the property received by the plaintiffs is rendered impossible by reason of their having parted with a portion of it before discovery of the fraud, the requirements of justice are satisfied by a return of the property on hand with compensation in money for the remainder. If, after allowing defendant's claim for the reasonable market value of all ore and bullion that plaintiffs may have sold, if any, there is still a balance due plaintiff, no express offer to return, in money, the actual value of such ore or bullion is necessary. The equities of the parties may be fully adjudged without such unnecessary circumlocution.

[7] PLEADING — CONSTRUCTION OF — COMMON-LAW RULE ABROGATED.— The common-law rule that a pleading must be construed most strongly against the pleader has been abrogated and superseded by the more liberal rule of the statute. The code requires not only a liberal construction, with a view to substantial justice between the parties, but also that the court shall disregard any defect in the pleadings which does not affect the substantial rights of the parties.

[8] ID.—FACTS WITHIN KNOWLEDGE OF DEFENDANT—UNCERTAINTY OF COMPLAINT.—As to those matters that lie peculiarly within the defendant's or her testator's knowledge, the defendant cannot be heard to complain that plaintiff has not alleged them with sufficient certainty.

APPEAL from a judgment of the Superior Court of Los Angeles County. Lewis R. Works, Judge. Reversed.

The facts are stated in the opinion of the court.

Harry W. Elliott and Schweitzer & Hutton for Appellants.

Mulford & Dryer for Respondent.

FINLAYSON, P. J.—Judgment was entered against plaintiffs upon a demurrer to their third amended complaint. The demurrer was general and special. This appeal is from that judgment.

The complaint shows plaintiffs' case to be substantially as follows: On November 5, 1913, T. H. Oxnam, since deceased, as party of the first part, and these three plaintiffs and defendant MacDonald, as parties of the second part, entered into a written contract whereby Oxnam agreed to sell to plaintiffs and MacDonald an undivided four-fifths of a mine then owned by Oxnam, upon these terms: The parties of the second part, four in number, were given the right to purchase the undivided four-fifths for twenty thousand dollars. This twenty thousand dollars was to be paid in two years, as follows: A promissory note, for seven thousand five hundred dollars, executed by MacDonald, payable on or before October 31, 1915, was to be given to Oxnam, and the balance, twelve thousand five hundred dollars, was to be paid out of the net proceeds from the mining property, which, it was agreed, should be worked by the four purchasers. It further was agreed that the purchasers, plaintiffs and MacDonald, should deposit the sum of twenty-two thousand five hundred dollars in bank. Of this sum, not less than fifteen thousand dollars was to be expended by the purchasers in the installation of a new cyanide plant, repairs to the mill, and installation of additional equipment, the balance, if any, to be used as working capital. It also was agreed that, after Oxnam had received from the profits of the mining operations all of the balance of the twenty thousand dollars, left after subtracting Mac-Donald's note for seven thousand five hundred dollars, and after plaintiffs and their associate, MacDonald, had received thirty thousand dollars from the proceeds, then, but not before, Oxnam should be entitled to profits on the undivided one-fifth that he retained.

Before entering into the contract with Oxnam to purchase the undivided four-fifths, it was agreed between plaintiffs and MacDonald that if they made the contract with Oxnam they would operate the mine as equal and joint owners and equal active partners. All the details of the purchase and the negotiations leading up to the contract with Oxnam were left to MacDonald. Plaintiffs relied upon MacDonald's honesty and upon his becoming equally interested financially with them in the purchase. Oxnam knew MacDonald represented plaintiffs, and that he was acting for them as an equal partner.

Prior to and in anticipation of the execution of the contract to purchase from Oxnam the undivided four-fifths, MacDonald, notwithstanding he and plaintiffs were co-adventurers in the purchase of the property, entered into a secret side agreement with Oxnam, whereby Oxnam agreed with MacDonald that if the operation of the mine did not produce sufficient profits to enable the latter to pay his note to Oxnam for seven thousand five hundred dollars, within the two years, he should have the right to reconvey to Oxnam his one-fifth interest in the mining property, and Oxnam would thereupon return his note to him. This secret side agreement between Oxnam and plaintiffs' joint associate, MacDonald, was entered into "in consideration of plaintiffs signing the said contract"—the contract of purchase that plaintiffs and MacDonald made with Oxnam. Had plaintiffs known of the secret agreement between their associate, MacDonald, and Oxnam, they would not have entered into the contract of purchase with Oxnam. The existence of this secret side agreement was not discovered by plaintiffs until August 11, 1915, when MacDonald informed them of it.

Plaintiffs and MacDonald entered into possession of the mining property and operated it. Its operation, however, proved unprofitable. MacDonald has never paid any part of his note to Oxnam. In operating the property plaintiffs expended, in all, $32,894.27, of which twenty-two thousand five hundred dollars was expended in installing the new cyanide plant and as otherwise provided in their contract with Oxnam; $4,486 was expended in other improvements which have become a part of the property, and the balance in operating expenses.

Oxnam died February 16, 1915. Thereafter letters testamentary were issued to the defendant and respondent, Mamie Oxnam, who is now the sole defendant, the action having been dismissed as to defendant MacDonald on plaintiffs' motion.

Upon discovering the secret side agreement between Oxnam and MacDonald, plaintiffs, claiming to have been defrauded thereby, and that they had been damaged by reason of the expenditures they had made under their contract with Oxnam during the time when they had no reason to believe the contract tainted with fraud, entered into negotiations with the executrix and her legal advisers, in an endeavor to effect a settlement of their claim for damages. These negotiations, extending over a period of about seven weeks, proving ineffective, plaintiffs served upon the executrix a notice of rescission, and about two weeks thereafter presented to her, as executrix, their verified claim for $32,841.66, the moneys so expended by them under their contract of purchase with defendant's testator. The claim having been retained by the executrix for more than ten days without being allowed, this action was commenced.

We shall first consider whether the complaint states a cause of action and is good as against the general demurrer.

It is of no consequence whether appellants and their associate, MacDonald, ever became partners, in any strict sense of the term, nor what may be the respective rights and obligations of mining partners, *inter sese.* Appellants and MacDonald were joint adventurers in a common enterprise—an enterprise that contemplated the purchase of the undivided four-fifths of the mine and the operation of the property, not only for ultimate profit, but as a means of paying to their vendor the balance of the purchase price over and above the seven thousand five hundred dollars that MacDonald was to pay pursuant to the terms of his promissory note to their vendor.

The tendency of the modern decisions is to regard the right of joint adventurers, as between themselves, as governed practically by the same rules that govern the relations of partners. (15 R. C. L. 500.) [1] The relation between joint adventurers is fiduciary in its character. The utmost good faith is required of each in his dealings with the others. Each will be held strictly to account to his coadventurers,

He will not be permitted to enjoy any unfair advantage, or any greater rights than he and his coadventurers are entitled to under the terms of their agreement or understanding. The mere fact that he is intrusted with the rights of his coadventurers imposes upon him the duty of guarding their rights equally with his own. In accordance with the principles of good faith and confidence governing the relations of joint adventurers, a coadventurer may not conceal his interest or his profits from his associates in the enterprise. None will be allowed to obtain by secret agreement any advantage over the others. The consent of each to the joint adventure is usually given, and the money of each obtained, on the understanding and belief that the funds, interest, and aid of each are and will be given to the enterprise within the bounds agreed upon. [2] The failure of one of the several joint adventurers, in an enterprise looking to the purchase of property, to share with his coadventurers any secret advantage given by their vendor for inducing the purchase by the other coadventurers, is such a breach of confidence as amounts to constructive fraud, and will entitle his coadventurers either to rescind the contract, or to maintain an action for damages for fraud and deceit against either or both parties to the secret understanding, or to have the coadventurer receiving the benefit account to his associates in the enterprise. (15 R. C. L. 500–503; 23 Cyc. 452 et seq.; *Noble* v. *Fox*, 35 Okl. 70, [43 L. R. A. (N. S.) 933, and note, 128 Pac. 102]; *Jefress* v. *Phillips*, 31 Okl. 202, [120 Pac. 916]; *Gilpin* v. *Netograph Mach. Co.*, 25 Okl. 408, [29 L. R. A. (N. S.) 477, 108 Pac. 382]; *King* v. *White*, 119 Ala. 429, [24 South. 710]; *Kennah* v. *Hoston*, 15 Wash. 275, [46 Pac. 236]; *Grant* v. *Hardy*, 33 Wis. 668; *Lind* v. *Webber*, 36 Nev. 623, [Ann. Cas. 1916A, 1202, 50 L. R. A. (N. S.) 1046, 135 Pac. 139, 141 Pac. 458]; *Hambleton* v. *Rhind*, 84 Md. 456, [40 L. R. A. 216, and note, 36 Atl. 597]; *Humburg* v. *Lotz*, 4 Cal. App. 438, [88 Pac. 510]; *Richards* v. *Fraser*, 122 Cal. 456, [55 Pac. 246]; Id., 136 Cal. 460, [69 Pac. 83]; *Llewelyn* v. *Levi*, 157 Cal. 31, [106 Pac. 2, 19]; *Denis* v. *Gordon*, 163 Cal. 427, [125 Pac. 1063]; *Lomita L. & W. Co.* v. *Robinson*, 154 Cal. 36, [18 L. R. A. (N. S.) 1106, 97 Pac. 10]; *California etc. Min. Co.* v. *Walls*, 170 Cal. 285, [149 Pac. 595].)

[3] As a rule, cases of the character now under considera-
tion are cases where the perfidious joint adventurer, by
a secret side agreement, has gained some profit, either in
money or property, in which his coadventurers will be held
entitled to share. Such was the case in *Lomita L. & W. Co.*
v. *Robinson, supra.* Or they are cases where the unfaithful
coadventurer, by a secret agreement with the vendor of the
joint adventurers, has received his share of the property pur-
chased gratuitously, or for less than the amount contem-
plated by his agreement with his associates. This was the
case in *Noble* v. *Fox, supra.* Here, however, MacDonald did
not receive any secret commission, or any advantage, either
in money or property, of such a nature that his coadven-
turers can share therein; nor was he to receive his un-
divided interest in the mine gratuitously. However, we
think the case clearly falls within the principle announced in
the cases cited *supra.*

[4] In actions of this character it is not necessary that the
parties complaining of the breach of faith on the part of
their coadventurer should allege or prove that they have
actually been injured by his breach of their confidence. Un-
questionably it is the general rule that fraud without injury
is not ground for relief, either in law or equity; though
even under this general rule the injury need not be of such
a nature that it can be accurately measured in money, but
it will suffice if the defrauded party has been but very
slightly prejudiced. (*Spreckels* v. *Gorrill,* 152 Cal. 383,
388, [92 Pac. 1011].) Though it is the general rule that
fraud without at least some slight injury is not ground for
relief, this general rule is not an obstacle to recovery in cases
of the kind here under consideration, even though there be
a total absence of injury to the complaining party. That
is, where one occupies a fiduciary relation to the plaintiff,
and, acting in co-operation with the defendant, he abuses
the confidence of the plaintiff, his associate in a common
enterprise, by entering into a secret agreement with the de-
fendant, the general rule that fraud without injury is not
ground for relief is not applicable, and the plaintiff will be
entitled to relief whether he has been injured or not. Both
law and equity have a most tender regard for the rights of
a complaining party growing out of a fiduciary relationship.
So that where any abuse of that relation is discovered, the

complaining party is entitled to relief, whether any actual damage be established or not. In this class of cases, the question is not whether the breach of confidence has resulted in profit to the unfaithful coadventurer, or whether it has resulted in injury to his joint adventurers, but whether there has been a breach of confidence on the part of the fiduciary. The great solicitude of the courts has been rather wholly to avoid any recognition of a principle that, in the hands of avaricious and cunning men, might be turned to their own account, than to inquire whether the complaining party has suffered any actual disadvantage. The rule that a coadventurer must act with utmost good faith, and in all things be faithful and loyal to his associates and to the purpose of the enterprise, is not intended to be remedial of actual wrong, but preventive of the possibility of it; and it matters not that there is no fraud meditated and no injury done. (*Henninger* v. *Heald*, 52 N. J. Eq. 431, [29 Atl. 190]; affirmed, 53 N. J. Eq. 694, [35 Atl. 1130].)

But even if, in cases of this character, it were necessary to show injury in order to entitle the complaining party to relief, we think the complaint, if "liberally construed, with a view to substantial justice between the parties" (Code Civ. Proc., sec. 452), does show injury to plaintiffs. Under the terms of the contract of purchase made by MacDonald and plaintiffs with Oxnam, the four purchasers were to receive an undivided four-fifths of the mine. The complaint alleges that it was agreed between MacDonald and appellants, before making their contract of purchase with Oxnam, that if they entered into the contract with Oxnam, the four would own and operate the property "as equal joint owners and equal active partners," and that appellants relied upon Mac-Donald "becoming equally interested financially" with them "in the purchase of the said mining property." Under the terms of the contract of purchase each of the four associates was to be liable for the payment of some money, whether the venture proved to be profitable or otherwise. Mac-Donald was to pay seven thousand five hundred dollars upon the maturity of his note to Oxnam, and each of the three appellants was to be liable for his share of the twenty-two thousand five hundred dollars that was to be advanced for the installation of the new cyanide plant, the purchase of the other and additional equipment and the working capital.

The complaint does not allege whether, according to the agreement between the four purchasers, MacDonald was to furnish any part of this twenty-two thousand five hundred dollars. But whether he was or not, it certainly was understood that, on or before the maturity of his note to Oxnam, he was to pay at least the face of that note, seven thousand five hundred dollars. In other words, though the complete understanding between MacDonald and appellants is not disclosed by the complaint, nevertheless, whatever it may have been, MacDonald, whether the enterprise proved a losing or a profitable venture, whether the mining property proved valuable or valueless, was to pay seven thousand five hundred dollars at least, and, possibly, a part of the twenty-two thousand five hundred dollars; and each of appellants was to pay his share of the twenty-two thousand five hundred dollars—regardless of how the venture terminated. In short, the agreement between the four joint adventurers, whatever it may have been in its entirety, required of each the payment of a sum of money, win or lose. But, by reason of the secret side agreement between Oxnam and Mac-Donald, the latter, if the venture proved unprofitable, was to be relieved of the payment of his agreed share of the purchase price, to the extent, at least, of the sum evidenced by his note—seven thousand five hundred dollars—upon his reconveying to Oxnam his share of the purchased property —an undivided one-fifth of the mine. This secret side agreement was, therefore, unquestionably one of considerable advantage to MacDonald, and, of course, a corresponding disadvantage to the vendor, Oxnam, who, in the event that his mine proved worthless after the efforts of the four joint purchasers to work it profitably, was not to receive the seven thousand five hundred dollars which the contract between him and his four vendees contemplated that he should receive in any event, upon the maturity of the note executed to him by MacDonald. It is a reasonable inference, therefore, that if Oxnam had not made this prior, secret side agreement with MacDonald, he could have afforded to make, and, possibly, might have made, with the four coadventurers and purchasers, an agreement more advantageous to appellants. It is alleged in the complaint that Oxnam gave Mac-Donald the secret side agreement ''in consideration of plaintiffs signing the said contract,'' i. e., the contract of

purchase that appellants and MacDonald made with Oxnam. The only reasonable inference from this allegation is that Oxnam, deeming his secret side agreement with MacDonald of advantage to the latter, concluded he could make it a means whereby to secure the execution by appellants of the contract of purchase that finally was made, by using Mac-Donald as a decoy to get his coadventurers into the deal upon terms satisfactory to Oxnam, that is, upon the terms set forth in the contract of purchase as finally made. Any such trick as that is a fraud; and if it resulted in a contract of purchase less advantageous to appellants than they otherwise would have secured, it worked an injury to them.

By entering into the written contract of purchase, along with his coadventurers, MacDonald, in effect, represented to them that he was purchasing an undivided interest upon the terms in that contract set forth. This representation, inferable from the fact that he agreed to become one of the joint purchasers upon the terms and conditions set forth in the written contract of purchase, may well have been a substantial inducement to his coadventurers to join with him in their contract with Oxnam. Appellants left it to Mac-Donald to carry on the negotiations for the purchase of the property. We cannot read the complaint without being impressed with the idea that MacDonald was the leader in the joint enterprise, and that appellants, his coadventurers, placed great reliance upon his judgment and faith in their proposed venture. For this reason MacDonald, by joining with appellants in the purchase of the property, thereby may have, and possibly did, lead his associates to believe that his confidence in the outcome of their enterprise was such that he was willing to obligate himself to the extent of seven thousand five hundred dollars, at least, whether the venture proved profitable or otherwise. For this reason the mere fact that MacDonald executed the contract of purchase as a joint purchaser with appellants afforded ample basis for the allegation that, had appellants known of the secret side agreement, they would not have entered into the contract with Oxnam to purchase the property.

In view of the failure of the complaint fully and completely to set forth the understanding between appellants and MacDonald, we have assumed that McDonald was to put put up some part of the twenty-two thousand five hundred

dollars that was to be advanced to purchase the new cyanide plant, etc., thus assuming the situation to be that which is the most favorable to respondent. However, from certain facts appearing upon the face of the contract of purchase itself, as well as from facts alleged in the complaint, we are disposed to surmise that the understanding between the four joint adventurers was that MacDonald was to give his note for seven thousand five hundred dollars, but was not to be obligated to pay any further sum, and that each of his three associates was to put up, in cash, a similar amount, thus making the total amount of cash to be advanced by the three appellants equal the sum of twenty-two thousand five hundred dollars—the amount that the purchasers agreed was to be advanced to purchase the new cyanide plant, etc. If this assumption be correct, then, if MacDonald continued unconditionally obligated to pay his note for seven thousand five hundred dollars, as contemplated by the contract of purchase made by himself and coadventurers with Oxnam, each of the four would be obligated for seven thousand five hundred dollars, or one-fourth of thirty thousand dollars. This surmise comports with that provision of the contract whereby it is provided that Oxnam was not to receive any of the profits from the mine until the four purchasers had taken out of the profits, if any there might be, not only the balance of what was denominated the purchase price—twelve thousand five hundred dollars—but the further sum of thirty thousand dollars. In other words, we are inclined to the supposition that, according to the agreement between the four coadventurers, whatever that agreement in its entirety may have been, each of them was to obligate himself to Oxnam in an equal amount, and each was to pay his share whether any profits were received from the mine or not,. except that MacDonald, instead of being required to make an immediate payment of his share, seven thousand five hundred dollars, was not to pay his *pro rata* until the maturity of his note. This assumption accords with the allegation of the complaint that appellants relied upon MacDonald becoming "equally interested financially with the plaintiffs in the purchase of the said mining property." If this be so, then the effect of the secret side agreement between Oxnam and MacDonald would be this: MacDonald, as well as Oxnam, without paying or becoming obligated for any sum whatever,

but at appellants' risk and expense, and on the strength of the twenty-two thousand five hundred dollars to be advanced by appellants, would receive the benefit of all development work to be done on the mine; so that, if the mine proved to be valuable, MacDonald, as well as Oxnam, without incurring any risk, but at appellants' expense, would have his undivided one-fifth demonstrated to be a valuable interest, and if the mine turned out to be valueless, he and Oxnam would lose nothing beyond their fleeting expectations of valuable mining interests, while appellants would be out twenty-two thousand five hundred dollars. However, irrespective of whether or not we have conjectured correctly the nature of the agreement between MacDonald and his three associates, the result of this appeal must be the same. For this much is certain: MacDonald, according to the contract of purchase, was to be obligated for at least seven thousand five hundred dollars, and this sum, according to the understanding evidenced by the contract of purchase, he was to pay in any event, whether the venture proved to be a winning or a losing proposition; but, according to his secret side agreement with Oxnam, unknown to his associates—a secret agreement entered into "in anticipation of the execution of the contract of purchase" and "in consideration of plaintiffs signing the said contract" of purchase—MacDonald was not to pay even that seven thousand five hundred dollars, in the event that it should turn out that the mining operations did not return a profit sufficient to enable him to pay his note out of his share of the profits. This, for reasons already stated, was a fraud upon his joint adventurers—a fraud that entitled them to rescind their contract with Oxnam as an aider and abetter in the consummation of that fraud.

Respondent suggests that Oxnam never became a partner of appellants, that, therefore, there was no fiduciary relation between him and them, and that, consequently, he is not liable, his secret side agreement with MacDonald notwithstanding. This, clearly, is *non sequitur*. MacDonald, as a coadventurer of appellants, occupied toward them a confidential relation that demanded of him the utmost good faith in all his dealings with, or on behalf of, his associates in the common enterprise, and precluded him from making, for the advantage of himself or Oxnam, the secret side

agreement, the making of which was a breach of his duty to appellants and a fraud upon them. Oxnam, knowing all the facts, aided and abetted him in the consummation of this fraud. Oxnam, therefore, was as much guilty of this constructive fraud as was MacDonald. (*Lomita L. & W. Co.* v. *Robinson,* 154 Cal. 36, [18 L. R. A. (N. S.) 1106, 97 Pac. 10] ; *King* v. *White,* 119 Ala. 429, [24 South. 710].) "Persons united for a common purpose must be loyal to that purpose and to each other. None may . . . secure an unfair advantage over those interested with him. . . . Those aiding him in procuring an advantage may, in equity, be held liable with him for the fraud." (23 Cyc. 455.) For this reason Oxnam's contract with appellants was tainted with fraud, upon the discovery of which appellants were entitled to rescind the vitiated contract. (*Noble* v. *Fox,* 35 Okl. 70, [43 L. R. A. (N. S.) 933, 128 Pac. 102].)

Though notice of appellants' election to terminate their contract with Oxnam was given to respondent, as executrix, and this action to obtain a judicial decree of rescission and be restored to the *status quo* is an appropriate remedy, it is claimed by respondent that appellants lost their right of rescission by failure to assert it promptly. There seems to be some confusion in the minds of respondent's counsel in regard to the precise nature of the fraud of which appellants complain. Respondent's counsel say that if the secret side agreement between MacDonald and Oxnam affected the operation of the mine to any appreciable extent, appellants could not have gone on with their operations for a year and nine months without having their suspicions aroused. But clearly this is not an action where appellants are complaining of any fraudulent misrepresentations as to the character or value of the mining property. What they complain of is the disloyalty of their coadventurer, MacDonald, in concealing from them the fact that their common vendor, Oxnam, was willing, if the mining operations did not prove profitable, to take back MacDonald's share of the undivided four-fifths agreed to be conveyed to the four associates, and relieve him from all obligation to pay the seven thousand five hundred dollars which, by the contract of purchase and his promissory note, he had obligated himself to pay as his share, or at least as a part of his share, of the entire purchase price, regardless of how the joint enterprise eventuated.

It no doubt is the general rule that one seeking to rescind a contract must exercise the right promptly upon discovering the facts which entitle him to rescind. Here the fact relied upon as giving the right to rescission is the existence of a secret contract between respondent's testator and appellants' coadventurer, MacDonald. In the nature of things, that fact, hidden in the secret recesses of the hearts of Mac-Donald and Oxnam, could not be discovered until one or the other in some manner communicated it to the outside world. Appellants are not chargeable with remissness because they did not discover the fact until it was communicated to them by MacDonald on or about August 11, 1915.

[5] While it is true that appellants did not give notice of rescission until about seven weeks after the discovery of the secret agreement, the delay was the result of indulgences extended to them by respondent, who, by countenancing negotiations with appellants in their endeavor to effect a compromise and settlement of their claim, necessarily led appellants to refrain from giving that notice of rescission which is a necessary prelude to a contest in court for a judicial decree of recission. Notice of rescission has been held to be within reasonable time if given within two months after the discovery of the fraud. (*Hill* v. *Wilson,* 88 Cal. 92, 97, [25 Pac. 1105].)

It is claimed that sufficient diligence was not shown in bringing the suit after the notice of rescission. It does not appear when the original complaint was filed. On the other hand, it does appear that any delay which there may have been in bringing the suit after the discovery of the secret agreement and the notice of rescission was, or could have been, at all injurious to respondent or the estate which she represents.

Respondent's contention that the complaint fails to show that appellants offered to restore to Oxnam, or to his estate, everything of value received by them under the contract, is not tenable. The complaint specifically alleges not only that appellants and MacDonald have executed and delivered to the heirs of Oxnam a quit-claim deed to the mining property, as requested by the representatives of the estate, and have turned over to the representatives of the estate the possession of the mine, personal property, supplies, and equipment, but that ap-

pellants have actually restored and returned "everything received under or by virtue of said contract of purchase or mining operations." It is true that it appears, inferentially, that appellants disposed of bullion from the mine. They allege that they spent $5,908.18 for repairs, supplies, and operating expenses, "over and above all moneys received by them . . . for the bullion receipts or other proceeds of said mining business." Respondent contends that the receipts for the bullion may have been less than its reasonable market value, and cites *Bailey* v. *Fox,* 78 Cal. 389, [20 Pac. 868], to support her claim that a sufficient offer to restore the *status quo* has not been shown. In view of the express allegation that appellants actually have restored to the estate of T. H. Oxnam, deceased, everything of value received, we must conclude that they either repurchased the bullion and returned it to Oxnam's estate, or else that its value is less than any balance that appellants may be entitled to recover. [6] Where, in an action of this character, a return in specie of all the property received by the plaintiff is rendered impossible by reason of his having parted with a portion of it before discovery of the fraud, the requirements of justice are satisfied by a return of the property on hand with compensation in money for the remainder. (*Basye* v. *Paola Min. Co.,* 79 Kan. 755, [131 Am. St. Rep. 346, 25 L. R. A. (N. S.) 1302, 101 Pac. 658]; *Wright* v. *Dickinson,* 67 Mich. 580, [11 Am. St. Rep. 602, 35 N. W. 164]; *Henninger* v. *Heald,* 52 N. J. Eq. 431, [29 Atl. 190]; affirmed, 53 N. J. Eq. 694, [35 Atl. 1130]; *Spreckels* v. *Gorrill,* 152 Cal. 383, 392–394, [92 Pac. 1011]; Civ. Code, sec. 3408.) If, after allowing respondent's claim for the reasonable market value of all ore and bullion that appellants may have sold, if any, there is still a balance due appellants, no express offer to return, in money, the actual value of such ore or bullion is necessary. The equities of the parties may be fully adjudged without such unnecessary circumlocution. "One who attempts to rescind a transaction on the ground of fraud is not required to restore that which in any event he would be entitled to retain." (*Richards* v. *Fraser,* 122 Cal. 456, [55 Pac. 246]; Id., 136 Cal. 460, [69 Pac. 83]; *Matteson* v. *Wagoner,* 147 Cal. 739, 744, [82 Pac. 436].)

For the foregoing reasons we think the complaint, considered as a whole, that is, read as though the matters erro-

neously stricken therefrom had remained in, states a cause of action, and that it is good as against respondent's general demurrer.

Nor do we think the complaint vulnerable under the attack by the special demurrer. It is true it is not a model pleading, stating in ordinary and concise language the facts constituting the cause of action. Still it is not fatally uncertain in any of the particulars pointed to by the special demurrer. We readily can see from the facts pleaded, that, by more direct allegations of certain facts that seem clearly inferable from the facts alleged, as well as from the facts disclosed by the terms of the contract of purchase, appellants easily might have avoided any attack on the ground of uncertainty. [7] However, we think the complaint sufficient if its allegations be liberally construed, with a view to substantial justice, as is required by section 452 of the Code of. Civil Procedure, whereby the old common-law rule that a pleading must be construed most strongly against the pleader has been abrogated and superseded by the more liberal rule of the statute. (*Estate of Wickersham,* 153 Cal. 603, 96 Pac. 311].) In recent years great changes have been wrought by the code in the rules for the construction of pleadings. For sufficiency of the facts pleaded, courts look to substance, not to form. The basic principle of the code procedure is that the administration of justice should not be embarrassed by technicalities, strict rules of construction, or useless forms. This liberal spirit has even been carried into the constitution. (Const., sec. 4½, art. VI.) The code requires not only a liberal construction, with a view to substantial justice between the parties, but also that the court shall disregard any defect in the pleadings which does not affect the substantial rights of the parties. (Code Civ. Proc., sec. 475.) Construing the complaint in the light of these liberal provisions, we think it impregnable to the attack made upon it by this demurrer.

[8] Many of the particulars as to which the demurrer charges uncertainty are matters that lie peculiarly within respondent's or her testator's knowledge, as, for instance, the facts immediately connected with the secret side agreement between MacDonald and Oxnam, also the facts connected with the time within which appellants' verified

claim should have been presented. As to such facts respondent cannot be heard to complain that appellants have not alleged them with sufficient certainty.

Nor do we think the court was justified in granting respondent's motion to strike out certain parts of the complaint. Many of the allegations stricken out were relevant and material. For example, the allegations that the secret side agreement was entered into "in anticipation of" the execution of the contract of purchase and that it was entered into "in consideration of plaintiffs signing the contract of purchase," were certainly material. The allegation that the secret side agreement was entered into "in anticipation of" the execution of the contract of purchase tends to show the connection between the two agreements, and that Oxnam and MacDonald were conspiring to bring about the execution of the contract of purchase by using MacDonald as a decoy. So, also, the allegation that the execution of the contract of purchase was the "consideration" for the secret side agreement tends to show the use of MacDonald as a decoy to induce appellants to enter into a contract that otherwise they possibly would not have made.

The judgment is reversed, and the court below directed to overrule the demurrer to the complaint with leave to defendant to answer.

Sloane, J., and Thomas, J., concurred.