J. E. TUSANT & SON COMPANY et al., Appellants, v. CHAS. WEITZ SONS et al., Appellees.

**JOINT ADVENTURES:** **Necessity for Contract.** There may not be a joint adventure without a contract therefor, express or implied. Record reviewed, and held insufficient to show that divers persons, firms, and corporations had mutually entered into a contract to the effect that one of their number should secure, in his own name, but for the joint benefit of all of said various parties, the contract from the Federal government for the erection of an army cantonment.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

FEBRUARY 13, 1923.

REHEARING DENIED JUNE 22, 1923.

A SUIT in equity for an accounting. It is contended that the parties hereto were engaged in a joint adventure in the construction of the cantonment at Camp Dodge, the government contract for which was taken in the name of the defendant Charles Weitz' Sons. The court denied the relief sought. The facts appear in the opinion.—*Affirmed.*

*C. S. Bradshaw* and *Casper Schenk,* for appellants.

*Brockett, Strauss & Blake* and *Miller, Kelly, Shuttleworth & Seeburger,* for appellees.

Faville, J.—The pleadings in the case are quite voluminous. The appellants are the plaintiff and cross-petitioners. No relief is sought against any of the appellees except the firm of Chas. Weitz' Sons. Condensing the initial question in the case to its simplest form, it is the contention of the appellants that they, together with the appellees, thirteen persons in number, constituted a voluntary unincorporated association known as the "Master Builders' Association of the city of Des Moines," and that, acting jointly and for their mutual benefit, all of said parties were instrumental in securing a contract from the United States government for the erection of the cantonment at Camp Dodge; that said contract was taken in the name of the appellee Chas. Weitz' Sons, for the benefit of all of said parties; and that the appellants are entitled to an accounting for their share in the profits secured under said contract. Certain of the members of said association who did not join by cross-petition in the relief sought by plaintiff are made parties defendant, and are appellees herein, but the action is primarily against Chas. Weitz' Sons. The appellees filed a joint answer, containing a general denial, with certain special defenses.

It is uncontradicted that a written contract was entered into between the proper officials of the United States government and the appellee Chas. Weitz' Sons, providing for the erection of the cantonment at Camp Dodge, which contract provided for the payment to the said contractor of a fee upon a graduated scale, depending upon the total cost of the cantonment, which fee, it is contended, amounted to $250,000.

The trial of the case occupied a number of weeks in the lower court, and the record is very voluminous. The case is triable before us *de novo,* and the first question for our consideration is whether or not the parties to this action entered into a joint adventure in relation to the subject-matter of the construction of the cantonment at Camp Dodge, and whether or not the contract procured from the United States government, the work done thereunder, and the fee obtained therefor, were all had and done under and pursuant to said joint adventure.

I. The law in regard to joint adventure is of comparatively recent origin. It is analogous to the law of partnership in many respects, but is not identical with it. *Goss v. Lanin,* 170 Iowa

57; *Reece v. Rhoades*, 25 Wyo. 91 (165 Pac. 449); *Brown v. Leach*, 189 App. Div. 158 (178 N. Y. Supp. 319); *Clark v. Muir*, 298 Ill. 548 (132 N. E. 193); *Menefee v. Oxnam*, 42 Cal. App. 81 (183 Pac. 379); *Slater v. Clark & Co.*, 68 Ill. App. 433; *Butler v. Union Trust Co.*, 178 Cal. 195 (172 Pac. 601); *National Sur. Co. v. Winslow*, 143 Minn. 66 (173 N. W. 181); 15 Ruling Case Law 500.

In *Wilson v. Maryland*, (Minn.) 189 N. W. 437, the Supreme Court of Minnesota recently said:

"To constitute a joint adventure, two parties must combine their property, money, efforts, skill, or knowledge in some common undertaking."

In *Fletcher v. Fletcher*, 206 Mich. 153 (172 N. W. 436), the Supreme Court of that state defined a joint adventure as "an association of two or more persons to carry out a single business enterprise for profit."

A joint adventure must, in all cases, be evidenced by a contract, and like other contracts, it need not be express, but may be implied. *Knapp v. Hanley*, 108 Mo. App. 353 (83 S. W. 1005); *National Sur. Co. v. Winslow*, supra.

In *Goss v. Lanin*, supra, we said:

"It is true that it is not necessary that there should be a specific formal agreement to enter into a joint enterprise, or that the interests of the parties should be definitely settled in such agreement, or that there should be a formal agreement as to sharing in the profits. If there be a joint enterprise proven, either by direct evidence of a mutual agreement to that end or by proof of facts and circumstances from which it is made to appear that such enterprise was in fact entered into, the law fixes their rights."

In *Nelson v. Lindsey*, 179 Iowa 862, we said:

"Parties may enter into a joint enterprise, whereby they assume mutual obligations to each other and agree to a basis of sharing profits. Such an arrangement may fall far short of being a partnership, though it has in it some of the elements of partnership. It is often denominated in the books as a joint adventure."

See, also, *Senneff v. Healy*, 155 Iowa 82.

At the outset, we are confronted with the fact question as

to whether or not the thirteen parties to this action, appellants and appellees, entered into an agreement among themselves that constituted a joint adventure. In determining this question, the general rules pertaining to the establishment of contracts, express or implied, are applicable. We must take into consideration the situation of the several parties, and what was said and done prior to the time of the alleged formation of the contract, as well as at the time thereof, and the subsequent acts and conduct of the parties. In other words, all proper and legitimate evidence bearing upon the question as to whether or not such an agreement was entered into, should be considered. The parties have availed themselves generously of the rules of evidence in such a case, and have evidently brought into the record all of the available evidence bearing upon this question. It is utterly impossible, within the reasonable length of an opinion, to set out even the substance of all of this testimony, or to do any more than attempt to epitomize some of its most salient features. The fact that we may fail to note some of the items of evidence that may be regarded as important by the respective parties is not any indication that we have overlooked the same or failed to give all the evidence due consideration in the determination of the case. It is not surprising that the evidence in the case is very largely in direct conflict, and that counsel for the respective parties draw diametrically opposite conclusions therefrom.

In May, 1917, the United States government undertook the construction of sixteen army camps, one of which was located at Camp Dodge, near the city of Des Moines. On June 13th of said year, Congressman Dowell, of Des Moines, telegraphed the secretary of the Greater Des Moines Committee as follows:

"Get together at once contractors in Des Moines, lumbermen, plumbers, electricians and all persons interested in construction work and arrange to send a man to Washington to take up with department contracts for construction of army camp at Des Moines."

Following the receipt of this telegram, a meeting was called by the Greater Des Moines Committee, and attended by men representing various trades and classes of construction, at which meeting there was a general discussion of the proposi-

tion that it was desirable that the contract for the construction of the cantonment be obtained by Des Moines parties; and committees were appointed to inventory the available equipment, both material and labor, in Des Moines that could be utilized for the contemplated work. Various telegrams passed between the Greater Des Moines Committee and citizens of Des Moines who were in the city of Washington at the time, in regard to said matters, the information being conveyed from Washington that the government preferred to let the contract to one company.

In the forenoon of June 15th, the said Master Builders' Association had a meeting, at which all the members were present except the appellant Garmer, who was not represented. Just exactly what happened at this meeting is the fighting point in this lawsuit. The evident purpose of this meeting was to attempt to devise some plan by which the contract for the construction of the cantonment could be secured for some party or parties in Des Moines, rather than to permit it to go to some other city. The form of contract that would be required by the government was not definitely known at the time. The matter was debated for more than two hours. Various plans were proposed, one among them being that the members of the Master Builders' Association should form a corporation and bid for the work as such, and also that the work should be taken jointly by all of the members of the association and divided among them. It was made known at this meeting that the War Department had indicated its desire to deal with a single party. The discussion covered a wide territory. At one time, it appears to have been suggested that the appellee Mardis Company endeavor to secure the contract for the association. The matter finally culminated in a statement or motion by the appellee Lovejoy. Just what happened in this connection is the subject of most violent dispute. It appears that one Arthur N. Neumann was secretary of the Master Builders' Association, and was present at the meeting referred to. It is the contention of the appellants that the secretary, at the time, took notes of the proceedings that were had, which notes he subsequently delivered to his clerk, who entered the same in the minute book of the Master Builders' Association. The entry in the minute book appears under date of June 12, 1917. The undisputed

evidence, however, is that the meeting was held on June 15th. The record as shown by the minute book is as follows:

"June 12, 1917. Meeting held at Master Builders' offices, with all members present. Discussion held regarding arrangements for combining efforts of Master Builders' Association to the contract for cantonment to be built in Des Moines. Motion by Mr. Lovejoy that members of Master Builders' Association combine their efforts to secure contract, and that M. B. A. bid through Charles Weitz & Sons Co. Motion seconded. Motion carried."

The appellees deny that the motion made at this meeting was in substance or effect as stated in the minutes.

Every item of testimony by both sides, with regard to what occurred at this meeting, is the subject of the most critical analysis by the respective parties. On the one hand, it is contended that a formal motion was duly made and seconded, and restated by the chairman of the meeting, and duly adopted exactly as recited in the minutes; while, on the other hand, it is contended that no formal motion was made, that no one acted as chairman of the meeting, and that the whole matter was very informal. The answer admits that "a motion was made and seconded and unanimously carried." What said motion was is, however, the vital and important inquiry. Whatever motion was made was the outgrowth of the general discussion that had taken place with regard to what method, if any, should be pursued to secure the contract for the construction of the cantonment by some party or parties in Des Moines, rather than to permit it to go to contractors residing outside of said city.

While the minutes of the meeting as recorded in the minute book were properly admissible in evidence, no proper objections having been interposed thereto, they are not conclusive upon the parties as establishing the terms and provisions of any contract, or that a contract was, in fact, entered into. The Master Builders' Association was an unincorporated association of individuals. The minutes as made by the secretary were not read over at the meeting in question, nor were they ever read or approved at any subsequent meeting. While admissible in evidence when properly proved by the secretary, they were not conclusive as to what transpired. They were subject to ex-

planation and contradiction. The party who made the motion, appellee Lovejoy, testified that he did not use the language stated in the minutes, in making the motion. In this he is corroborated by other witnesses for the appellees; while the appellants, who were present at the meeting, sustain the verity of the minutes in regard to the language of the motion that was made.

We must view this meeting somewhat in the light of the situation as to what had previously transpired, as well as what took place at the time, and also subsequently thereto. There is no doubt that there was a desire upon the part of all of these parties to secure the construction contract for someone resident in the city of Des Moines. It is also true that various plans were considered at the meeting, in an endeavor to evolve some scheme by which the Master Builders' Association, acting as a body, could secure the contract. A proposition to incorporate was suggested and abandoned. It was likewise proposed that the appellee Mardis endeavor to secure the contract. Mardis declined to undertake it. It was well known that the department at Washington had intimated that it desired to do business with one contractor only. As the outgrowth of the general discussion, a motion was made to the effect that the appellee firm Weitz' Sons should endeavor to secure the contract in its name. Resolved to its last analysis, the question is whether or not at that time it was mutually understood and agreed by all the members of the Master Builders' Association that the firm of Weitz' Sons was to endeavor to secure the contract for and in behalf of all the members of the said Master Builders' Association. In other words, Was any contract entered into which launched a joint adventure? The vital point is whether or not the motion as made was to the effect that Weitz' Sons should proceed to secure the contract, and have the co-operation and help of the Master Builders' Association in carrying it out, or whether there was a contract between the parties to the effect that Weitz' Sons should secure the contract from the government *for the Master Builders' Association.* The language of the minutes is to the effect "that M.B.A. [Master Builders' Association] bid through Charles Weitz & Sons Co." Lovejoy,

the maker of the motion, testified that the language used by him was:

"Inasmuch as we are agreed that it is impossible for us to obtain this contract for the association, I move that we request Mr. Weitz to go to Washington and see if his firm can obtain the contract, they to be responsible and we to assist them in every way we possibly can."

There is practically no dispute that, whatever the motion was, after it had been acted upon at the meeting, the appellee Fred Weitz stated: "Since you put it that way, I accept." The evidence tends to show that a committee was appointed by the Master Builders' Association to go to Washington to assist in securing the government contract. In any event, a number of the members of said association, including Fred Weitz, a member of the firm of Weitz' Sons, left for Washington the evening of the day on which the meeting was held. A number of other parties from Des Moines accompanied them, and interested parties in Washington were advised that such a delegation would arrive. After the meeting at Des Moines, Weitz completed a questionnaire which had been previously sent out by the authorities at Washington, and the evidence shows that several members of the Master Builders' Association arranged with their respective banks for additional credit which they thought might be needed. The secretary of the Greater Des Moines Committee advised interested parties at Washington by wire, to the effect that the Des Moines contractors had gotten together and were going to bid for the construction contract in the name of Charles Weitz' Sons.

Just what was said and done between the different members of the delegation on the trip to Washington is likewise a matter of dispute.

After their arrival in Washington, the representation was made to the secretary of war, through interested parties, that the proposed contract was to be made with one contractor, the Weitz firm, and it was also represented in writing that:

"It has been arranged that all contractors, if called upon, are to stop their present work and turn over to Chas. Weitz' Sons Company all their equipment, material, foremen, and workmen."

Most of the delegation, except Weitz, left Washington on June 20th, and on the following day, the contract was let to Weitz, and was formally signed on June 22d. Neumann, who was one of the delegation, having returned to Des Moines, received a telegram from a friend of his, connected with the War Department, as follows: "Congratulate you on cantonment contract awarded to Weitz." The contents of this message were not communicated to Weitz.

On June 24th, Weitz wired from Washington to his brother, a member of the firm, advising him with regard to having secured the contract, and asking him to commence preliminary work of organization for carrying it out. The telegram contained the following clause:

"Don't allow any member our association get peevish. They will, no doubt, all be used before we get through. As to compensation, all that can be said at this time is that the firm will handle this matter in a fair and equitable manner, and follow largely the advice of the advisory board. Any firm objecting to this are not wanted."

Upon receipt of this message, there was a meeting of the Master Builders' Association in Des Moines. There is some uncertainty as to how many of the members of the association attended this meeting. The telegram referred to was read to those present, except the clause, "Any firm objecting to this are not wanted."

After the return of Fred Weitz from Washington, the work of construction of the cantonment was undertaken immediately. The three appellees Benson, Mardis, and Lovejoy were selected by Weitz as an advisory committee, and the work was divided by Weitz into three general divisions. Benson was assigned to what was designated as the "department of labor," Mardis's duties were in relation to the commissary department, and Lovejoy's job was "quantity survey work." The work was conducted expeditiously to completion.

The amount of capital involved in the construction of the work varied from $300,000 to $500,000, and was all furnished by Weitz. A part, but not all, of the appellants handed to Weitz lists of their best employees, capable of assisting in the carrying out of the contract, and a number of these parties

were called as superintendents, foremen, or employees on the job. All were paid for their services. The evidence tends to show that several thousand men were gathered as rapidly as possible from Des Moines and various other points, to engage in the work of pushing the construction of the cantonment as rapidly as possible. Some of the appellants accepted various positions in connection with the work, and all doing so were placed upon the pay roll, and received the usual compensation for the character of work performed by them. The total wages so paid to the appellants were something less than $4,000. The fee allowed Weitz' Sons under the contract, on the "cost plus" plan, was $250,000. Weitz testified that, after the completion of the work, in consultation with the chief accountant, it was estimated that the "overhead" would be about $75,000. About December 20, 1917, Weitz had a meeting with the advisory board, with regard to the disposition of the net fee. Weitz' testimony was to the effect that he had informed the advisory board that he had decided to take the $175,000 fee, after deducting the "overhead," and divide it into seven parts, to be distributed, one part to F. W. Weitz, one part to Edward Weitz, and one part to Chas. Weitz' Sons, for "securing and financing the job," one part to Mardis, one to Lovejoy, and one to Benson, and "one part should be divided among these men who volunteered services in the camp," with the exception of $1,000, which should be given to Weitz' superintendent. About December 28, 1917, checks were mailed to seven of the appellants, in the following amounts: Tusant, $6,000; Getchell & Sugarman, $1,000; Baty, $4,500; Kucharo, $1,000; Brereton, $6,000; Maine & Son, $4,500; Neumann & Company, $1,000. The amounts so distributed were agreed upon by the three members of the advisory board and two members of the Weitz firm. Each of these checks had the following indorsement:

"Received of Charles Weitz' Sons $........ as additional payment for services rendered Camp Dodge cantonment per order of advisory board. Charles Weitz' Sons, Camp Dodge contract."

The members of the advisory board had already each drawn $1,000 a month during the progress of the work. Appellant Neumann had not performed any work in the matter of con-

struction, and had received no payment for services; and, after receiving the check for $1,000, he called upon the appellee Weitz, and asked him, in effect, how much his firm was to get out of it. The interview was brief and unsatisfactory. Weitz, in effect, told Neumann that the books had not been closed, and he did not know what the fee would eventually be, and would not know until after the government taxes had been determined. The appellant Tusant, after receiving his check, wrote to Weitz in regard to the matter, and suggested that he should receive as much compensation as Lovejoy, Benson, and Mardis, or at least $10,000, and referred to the work he had done and the compensation he had previously received therefor. To this letter Weitz replied, and among other things said, "I have tried conscientiously to carry out my promise mentioned in the message I sent from Washington, in dealing with the association contractors," and, after discussing the matter at length, said:

"It would have been a most ungenerous proceeding, had I handled the work other than I have, and not permitted the Des Moines contractors to participate in the fee resulting from this work."

A meeting of the Master Builders' Association was held February 9, 1918, and during this meeting Weitz was asked whether the Master Builders were to be paid any more, and if he was going to make an itemized statement of account. Weitz stated that he would probably be the most hated man in Des Moines when the contract was done, and saying, "Gentlemen, I will bid you good night," left the room. Thereafter, interested parties called a meeting of the Master Builders' Association for February 15th, and sent notices by registered letter to Weitz' Sons and to members of the advisory board. None of these parties attended, except Benson. Shortly thereafter, this action was begun.

The foregoing is a brief outline of the general character of the matters relied upon by the appellants as sustaining their contention that the parties entered into a joint adventure. No attempt has been made to recite the various items of evidence in detail.

Upon the appellants' own case, we are forced to the con-

clusion that the trial court was correct in its finding that the appellants had failed to establish that the several parties entered into an agreement or arrangement between themselves which constituted a joint adventure, in the undertaking of securing the contract for the erection of Camp Dodge and the fulfillment of such contract. At the outset, it was incumbent upon the appellants to establish, by a preponderance of the evidence, the essential fact that the members of the Master Builders' Association entered into an agreement mutually obligatory, by which the several parties thereto undertook to obtain the contract for the construction of the cantonment at Camp Dodge and to carry out and fulfill the same. It is obvious that the Master Builders' Association as an unincorporated organization was not a legal entity, and as such could not legally enter into a contract. The joint adventure, if any existed, was a mutual contract entered into by the thirteen individuals, firms, or corporations who made up the so-called Master Builders' Association. The appellants claim that these thirteen parties mutually agreed with each other to enter into a joint adventure. Such a contract can be made by competent parties, individuals, and firms, and a corporation may bind itself by a contract for a joint adventure the purposes of which are within its corporate powers. All of the appellants were competent to enter into a joint adventure; but such joint adventure must ultimately rest on a contract, either express or implied, which may be established by direct evidence, or proof of facts and circumstances from which it is made to appear that such enterprise was, in fact, entered into.

In this case, there were thirteen members of the Master Builders' Association. It is the claim of the appellants that the contract of joint adventure was entered into at a meeting of this association, and that the much disputed motion was to the effect that "the members of the Master Builders' Association combine their efforts to secure contract, and that M.B.A. bid through Charles Weitz & Sons Co." The appellant Garmer was not present at this meeting of June 15th. The action of the members of the voluntary association in adopting a motion could not be binding upon Garmer, as a party to a contract, without his consent thereto, either express or implied. There was no such consent on his part. There is no claim that anyone pres-

ent at the time had any authority to bind him by a contract, or that he ever became a party thereto by anything he ever said or did.

It is a matter worthy of consideration that, at the time of the meeting of June 15th, no one present either knew or assumed to know the terms and provisions of the contract which the government was about to let for the construction of the cantonment at Camp Dodge. No one knew that the contract was to be what is known as a ''cost plus'' contract, the ''profits'' to be in the nature of a fee for the service rendered, based upon the total cost of construction. From a careful examination and reading of all the evidence bearing upon the question, we are forced to the conclusion that the parties present at this meeting fully and definitely understood that the Master Builders' Association, as such, could not bid for or enter into a contract with the government for the construction of the cantonment. It was also obvious that the members of said association could not organize as a corporation, within time to submit a bid in that capacity. All present were actuated by the desire, in which local pride and patriotic zeal had a commendable part, that the contract should be secured for the city of Des Moines. We are satisfied from the evidence that the upshot and conclusion of this meeting was an understanding by those present that the Master Builders' Association, as such, could not bid for or secure the contract sought, but that the same must be obtained, if at all, by some individual contractor, and that it was finally suggested that the appellee Weitz' Sons should endeavor to secure the contract with the government, and that all of the other members of the Master Builders' Association present at the meeting would stand ready to lend all help and assistance necessary in constructing the cantonment. The evidence does not satisfy us that any mutual contract or agreement was entered into between the parties at that time that constituted a joint adventure. The firm of Weitz' Sons was not by any act created an agent or trustee for the other members of the Master Builders' Association. There were no mutual obligations by which the firm of Weitz' Sons could legally have compelled any member of the Master Builders' Association to do any act or thing toward the carrying out of the contract which it subsequently

secured from the government, nor was there any agreement on its part that bound it in any way to secure the contract, if possible, for the use and benefit of any other person than said firm. Furthermore, as before stated, the parties at that time did not know the terms and character of the contract which was to be let by the government.

It is strenuously claimed by the appellants that the preliminary negotiations, the proceedings at the meeting of June 15th, the sending of telegrams to Washington, the trip of the delegates and interested citizens of Des Moines to Washington, the things that were said and done in that city in the securing of the contract, the telegram sent by Weitz to his brother, the manner in which the contract was carried out, the payment of the so-called "bonus" or "additional compensation" to certain appellants, the conduct and admission of Weitz, as shown by the evidence, together with numerous other circumstances disclosed by the testimony, are sufficient to establish the existence of a contract between the several parties which created a joint adventure.

We have examined all of this evidence with care, and have considered the contentions of the respective parties with regard thereto; and taking it as a whole, we fail to find sufficient evidence to establish a contract or understanding between these several parties which the appellants can enforce against the appellee Weitz, and under which they are entitled to an accounting. The evidence as a whole is consistent with the contention that the understanding of the parties, so far as there was one, was to the effect that the firm of Weitz' Sons was to endeavor to secure the contract for the construction of the cantonment at Camp Dodge, if it could secure the same, and that the various members of the Master Builders' Association who were present at the meeting of June 15th would lend to Weitz' Sons, in the event that the contract was secured, all the help and assistance within their means which that firm might require, to carry out said contract. It was obvious to all of the parties that it was desirable that the contract be brought to the city of Des Moines. It was likewise obvious that it was a huge undertaking—by far the greatest that had ever come to the city. It was patent to all that the resources of the city, and outside re-

sources as well, would necessarily have to be drawn upon, to effectively accomplish such a gigantic enterprise. The Greater Des Moines Committee was interested in having the work done by a Des Moines contractor or contractors. It was desired that a "united front" of the contractors of the city should be presented to the War Department, so that it might be known that the efficient working forces of the city could be commanded to carry out the contract. Such an arrangement and such an understanding between the members of the Master Builders' Association falls far short of the establishment of a legal contract, with mutual obligations, which could be enforced between the respective parties. The members of the Master Builders' Association were not the only persons interested in securing for the city of Des Moines the contract for the construction of the cantonment. The evidence shows that lumbermen, plumbers, materialmen, electricians, and various classes of contractors were likewise interested in the matter, and it is quite within proper limits to say that the Greater Des Moines Committee was strenuously endeavoring to carry the impression to the officials at Washington that the entire resources of the city of Des Moines, of this character, could and would be available for the construction of the cantonment in the most expeditious manner. We are thoroughly satisfied from the record that there was no knowledge on the part of the War Department, in awarding the contract to Weitz' Sons, that this firm was in any way taking said contract for and in behalf of the Master Builders' Association. We think it was well understood that the contract was being made with the individual firm of Weitz' Sons, but that the resources and equipment of machinery, men, etc., in the entire city of Des Moines would be instantly available, if needed to carry on the work of construction. This, however, falls far short of establishing a contract of joint adventure.

The fact that certain of the appellants did furnish men and material in carrying out the contract is not conclusive on the question of their having done so in pursuance of a contract of joint adventure. Certain of appellants furnished men and material, and some of them performed services themselves, in the character of laborers, for all of which they received pay. We attach significance to the fact that, after

appellee Weitz had secured the contract with the government, and after it was publicly known that he had so secured it, none of the appellants, after his return from Washington, and prior to the commencement of the work, or at any time thereafter until the same was completed, called upon Weitz for any disclosure as to the terms and conditions of the contract which had been entered into. It is, to say the least, significant that, after Weitz returned from Washington, none of the appellants called upon him to ascertain the character of the contract he had secured, presumably for their mutual benefit. Surely, if these appellants understood that they had entered into a contract with Weitz, and that they were, as now claimed, equal joint adventurers with him in the enterprise, ordinary business sagacity, to say nothing of mere curiosity, would have prompted them to have inquired of Weitz the terms and conditions of the contract which he had secured from the government, and in which they were jointly interested. Had it been a joint adventure, as claimed by the appellants, they would naturally have been interested to know upon what basis the prospective profits were to be computed, and, likewise, what liability for losses, if any, they had incurred by entering into the joint adventure. The record is significantly silent upon this subject. The "aloofness" of Weitz, as designated by counsel for appellants, is scarcely sufficient explanation of the failure of the appellants, as claimed joint adventurers with Weitz in the contract, to at least inquire from him as to the conditions of the contract claimed to have been secured for their mutual benefit, and regarding their respective prospects for profits, or liability for losses thereunder. Without any inquiry or information whatever in regard to these matters, some of the members of the Master Builders' Association performed very valuable services in carrying out the contract. Others performed more limited services, and some none at all. The work progressed in this manner without, so far as the record discloses, any claim by any of the appellants of any right to participate in the contract as such, or of any share therein.

The initial question in this case is whether or not the several parties who were members of the Master Builders' Association entered into a mutual contract with each other to engage·

in a joint adventure. We fail to find that the appellants have established the formation of such a contract, either express or implied. The law applicable to cases of this kind is not obscure. The courts all recognize that the basis of a joint adventure is, of necessity, a contract, either express or implied, but, nevertheless, a contract. We hold that the evidence in this case fails to establish that the parties to this action engaged upon a joint adventure, as alleged.

II. Various special defenses are urged by the appellees. It is contended, among other things, that the contract entered into was one for personal services of the contractor, and one which, by its very terms, expressly forbade any assignment or transfer of any interest therein. It is also contended that the appellants are estopped by their acts and conduct from now claiming any interest in the contract or the proceeds thereof.

.It is unnecessary that we pass upon any of the special defenses pleaded by the appellees. We have considered them, together with the authorities cited in support of the same. We rest our decision of the case, however, upon the general proposition that the appellants have failed to establish a joint adventure entered into between the several parties, and have failed to prove that they have any interest in the contract entered into between the appellee Weitz and the government, or in the profits or proceeds received by the said Weitz under said contract. It therefore follows that the appellants are not entitled to an accounting. The decree of the trial court is in accord with the conclusions we reach from a careful reading and examination of the entire record in the case.

The decree appealed from must, therefore, be, and the same is,—*Affirmed*.

PRESTON, C. J., EVANS, STEVENS, and ARTHUR, JJ., concur.